# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2127

_____

| | | |
|---|---|---|
| Alex Nicolay Rife; Yulia Rife; Yola Rife, | * * * | |
| Petitioners, | * | Petition for Review of an |
| | * | Order of the Board of |
| v. | * | Immigration Appeals. |
| | * | |
| John Ashcroft | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: February 11, 2004
Filed: July 7, 2004

_____

Before LOKEN, Chief Judge, BOWMAN and WOLLMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

Alex Rife, his wife Yulia, and their daughter Yola entered the United States from Israel in 1993 and remained past the period authorized by their tourist visas. The Rifes applied for asylum and withholding of removal. After a hearing, the Immigration Judge (IJ) denied the application, granting them permission to voluntarily depart the United States at their own expense. See 8 U.S.C. § 1229c(b). The Board of Immigration Appeals (BIA) affirmed without opinion. The Rifes petition for judicial review of the denial of asylum and withholding of removal. They urge in the alternative that they be permitted to voluntarily depart, and Yola Rife

moves to dismiss her appeal on the condition that she is granted voluntary departure. The government urges us to affirm the agency decision and argues that we lack jurisdiction to extend the Rifes' voluntary departure beyond the period ordered by the BIA, which has now expired. We affirm the denial of asylum and withholding of removal. We resolve the voluntary departure issue in the Rifes' favor.

## I. Background

Alex Rife was born in Baku, Azerbaijan in 1957. His father is Jewish, but he was raised as a Russian Orthodox Christian, his mother's faith. Yulia Rife was born in Baku in 1957 to a Russian Orthodox father and a Jewish mother. They married in 1979. Yulia was baptized in the Russian Orthodox Church in 1984. Yola Rife was born in November 1979 in Moscow, where Alex, a cameraman, had been sent to film the 1980 Olympic Games. The Rifes returned to Baku and remained until 1990.

In 1988, when both Armenia and Azerbaijan were republics of the Soviet Union, conflict erupted over the disputed territory of Nagorno-Karabakh, an Azerbaijan province populated primarily by Armenians. Violence against Armenians occurred in Baku and other Azerbaijan cities. The hostilities were both ethnic and religious, as Armenians are predominantly Apostolic Christians and Azeris are predominantly Muslims. Many Christian churches in Baku were destroyed, including the Russian Orthodox church the Rifes attended. In late 1989, the Rifes hid an Armenian Christian mother and her children in their home for ten days. During the stay, shots were fired at the Rifes' home, they received threatening phone calls, and their roof was damaged by unknown assailants.

In January 1990, the Soviet Union declared martial law and deployed troops in Azerbaijan. When Alex Rife filmed the resulting anti-Soviet demonstrations in Baku, his camera was smashed and he was beaten and detained for twenty-four hours

in a government building.  A day or two later, the Rifes fled to Moscow on an airplane carrying Russians away from the hostilities in Muslim-dominated Baku. Prior to fleeing to Moscow, the Rifes had applied to many countries for permanent visas.  Only Israel had responded favorably, offering them citizenship and permanent resettlement visas under Israel's Law of Return because Yulia Rife's mother is Jewish.  Upon arriving in Moscow, Alex applied to Soviet authorities for permission to leave.  Permission was granted in June 1990, and the Rifes moved to Israel.

When the Rifes arrived in Israel, the government issued "oleh's certificates" and offered a "basket of absorption," government benefits available to Jewish immigrants. The Rifes accepted some benefits but declined others, allegedly because their goal was to come to the United States.  Both Alex and Yulia obtained employment in Haifa, and the family continued to receive government benefits.  However, when Yulia declared her interest in attending a Christian church, their initially friendly neighbors in Haifa insulted the family and threw stones at them, and Yola was teased by her school classmates.  Many students in Yulia's music class withdrew upon learning she is a Christian.  The Rifes moved and enrolled Yola in a new school, where she was more severely harassed about her religious beliefs.

The Rifes lived in Israel for three years.  In May 1993, they received Israeli passports.  Yulia and Yola entered the United States on six-month visas in mid-1993. Alex remained in Israel to repay Israeli government benefits totaling $6,500.  He then sold their remaining assets in Israel and entered the United States on a six-month visa in October 1993.  The Rifes arrived with nearly $10,000, intending to remain permanently, and currently reside in Missouri.  Alex and Yulia have had two more children while in the United States and have become active evangelical Christians. Proselytizing is an important part of their new religion.

The Rifes applied for asylum and withholding of removal in November 1993. The IJ denied the applications, finding them ineligible for asylum because they firmly resettled in Israel before entering the United States, and finding that they failed to demonstrate past persecution or a well-founded fear of future persecution in either Israel or Azerbaijan. Because the Rifes declined to designate a country of removal or citizenship, and because the IJ was unable to determine with certainty the country of which Alex and Yulia are "natives, subjects or citizens," the IJ ordered them removed to "the country where they last habitually resided," Israel, and if Israel refuses to accept them, "to the country which has control over the territory where they were born," Azerbaijan. The BIA affirmed without opinion in April 2003.

On appeal, the Rifes first argue that the BIA abused its discretion in affirming without opinion because the agency misapplied its own regulation. See 8 C.F.R. § 1003.1(e)(4). However, the BIA decision whether to employ this procedure in a particular case "is committed to agency discretion and not subject to judicial review." Ngure v. Ashcroft, 367 F.3d 975, 983 (8th Cir. 2004). When the BIA affirms without opinion, the IJ's decision becomes the final agency action, which we must affirm if it is supported by substantial evidence on the administrative record as a whole. See Tawm v. Ashcroft, 363 F.3d 740, 743 (8th Cir. 2004). When the agency has denied asylum and withholding of removal, the petitioner "bears the heavy burden of showing that his evidence 'was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.'" Melecio-Saquil v. Ashcroft, 337 F.3d 983, 986 (8th Cir. 2003), quoting INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992). That standard is now codified in 8 U.S.C. § 1252(b)(4)(B).

## II. Asylum

The Attorney General has discretion to grant asylum to an alien who is a "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is an alien who is unable or unwilling

to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The Rifes argue they are eligible for asylum as refugees from both Azerbaijan and Israel.

**A. Did the Rifes Firmly Resettle in Israel?** The Attorney General may not grant asylum to an alien who firmly resettled in another country before coming to the United States. See 8 C.F.R. § 208.13(c)(2)(i)(B).[1] The regulations provide that "[a]n alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 208.15. The circuits differ somewhat in the importance placed on whether the government establishes that the country of prior resettlement formally offered citizenship, permanent resident status, or some form of permanent resettlement. See generally Salazar v. Ashcroft, 359 F.3d 45, 50-51 (1st Cir 2004); Abdille, 242 F.3d at 485-86. We agree with the Third Circuit in Abdille that the text of 8 C.F.R. § 208.15 makes this an important factor and, indeed, the proper place to begin the firm resettlement analysis. But in some cases it will not be dispositive. For example, in our only decision resolving a firm resettlement issue, we affirmed the BIA's determination that the alien's four-year stay in Spain constituted firm resettlement even though his application for refugee status in Spain was still pending when he came to the United States. Farbakhsh v. I.N.S., 20 F.3d 877, 882 (8th Cir. 1994); accord Cheo v. I.N.S., 162 F.3d 1227, 1229-30 (9th Cir. 1998).

---

[1]The firm resettlement doctrine was codified prospectively in 1996 by the enactment of 8 U.S.C. § 1158(b)(2)(A)(vi). See generally Abdille v. Ashcroft, 242 F.3d 477, 483 n.4 (3d Cir. 2001). Only the regulation applies in this case because the Rifes applied for asylum prior to April 1997.

In this case, the Israeli government offered the Rifes permanent resettlement under the Law of Return, issued certificates evidencing citizenship when they arrived,[2] and issued passports in 1993. The Rifes argue that their Israeli citizenship and permanent visas are invalid because, though part Jewish by birth, they are practicing Christians. However, although Israel has apparently denied citizenship under the Law of Return to ethnic Jews who converted to another religion, the Rifes offered no evidence that Israel has ever *revoked* the citizenship of an *oleh* upon learning that he or she converted to Christianity. The record includes a State Department Advisory Opinion stating, "It is our understanding, after speaking with the Consular Affairs Department at the Israeli Embassy in Washington, that persons with Israeli passports are Israeli citizens and may return to Israel." The Rifes argue that their passports have expired and the Israeli government did not respond to their renewal request. The IJ discounted the non-response because the passport renewal request was only sent at the IJ's insistence and made many unnecessary references to the Rifes' intent to convert others to evangelical Christianity. See Ali v. Reno, 237 F.3d 591, 596 (6th Cir. 2001), and cases cited.

The Rifes further argue that they fall within the exception to the firm resettlement asylum bar found in 8 C.F.R. § 208.15(a). They contend that their entry into Israel was "a necessary condition of their flight from [persecution]" because Israel was the only country that offered them refuge from Azerbaijan, they stayed in Israel only long enough "to earn and save enough money to secure onward travel,"

---

[2]The record includes a document issued by the Israel Foreign Ministry that states in relevant part: "The Law of Return (1950) grants every Jew wherever he may be, the right to come to Israel as an 'oleh' (a Jew immigrating to Israel) and become an Israeli citizen. . . . Israeli citizenship becomes effective on the day of arrival in the country or of receipt of an oleh's certificate, whichever is later. A person may declare, within three months, that he/she does not wish to become a citizen." The Rifes received oleh's certificates and made no such declaration.

and they "have no familial, property, or employment ties to Israel." The IJ rejected this contention, finding "that the wife's departure from the Soviet Union culminated in their admission to Israel where they were resettled as refugees and granted Israeli citizenship, which was recognized by their procurement of Israeli passports." We agree. Prior to their arrival in the United States, the Rifes lived and worked in Israel for three years, receiving substantial government benefits, before leaving of their own accord. Their stay in Israel "was not a stopover en route to refuge in the United States." Farbakhsh, 20 F.3d at 882. Substantial evidence supports the IJ's finding that the Rifes firmly resettled in Israel before coming to the United States. The exception for refugees in transit does not apply, and therefore the firm resettlement regulation bars their application for asylum as refugees from Azerbaijan.

**B. Are the Rifes Refugees from Israel?** The Rifes may not be granted asylum as refugees from Azerbaijan because they firmly resettled in Israel. However, firm resettlement does not preclude them from establishing that events following resettlement constitute past persecution or create a well-founded fear of future persecution, entitling them to asylum as refugees from the country of resettlement, Israel. See Abdille, 242 F.3d at 492. The Rifes argue they are refugees from Israel. The IJ found that the Rifes established neither past persecution nor a well-founded fear of persecution in Israel. Substantial record evidence supports these findings.

The Rifes' claim of past persecution in Israel is without merit. The Israeli government allowed them to enter on permanent visas with financial assistance, issued them certificates evidencing citizenship, took no adverse action when they openly exhibited their Christianity, and provided Israeli passports when they wished to leave. "As for slurs and harassment from private individuals, these do not constitute persecution." See Fisher v. I.N.S., 291 F.3d 491, 497 (8th Cir. 2002).

The Rifes allege a well-founded fear of future persecution if they return to Israel, based primarily upon an anti-missionary bill pending in the Israeli Knesset that would impose a criminal penalty of up to a year in prison for religious proselytizing. The Department of State Country Report on Human Rights Practices for 1998 explained (at pp. 9-10):

> [Israel] law provides for freedom of religion, and the Government generally respects this right. . . . Missionaries are allowed to proselytize, although the Church of Jesus Christ of Latter-Day Saints has agreed not to do so under an agreement with the Government. A 1977 anti-proselytizing law prohibits anyone from offering or receiving material benefits as an inducement to conversion, but the law has not been applied for several years. In 1997 a bill was introduced to impose restrictions on proselytizing including a ban on the distribution of written materials encouraging conversions. A more restrictive bill that would ban virtually all forms of proselytizing passed a preliminary reading in the Knesset in April with significant government support.
>
> Neither bill is expected to be enacted. Christian and other evangelical groups assert that the draft bills are discriminatory and serve to intimidate Christian groups.

"Persecution is the infliction or threat of death, torture, or injury to one's person or freedom" on account of a statutory ground such as religion. Regalado-Garcia v. I.N.S., 305 F.3d 784, 787 (8th Cir. 2002). In this case, the Israeli government did not punish the Rifes for proselytizing during their three years in Israel because they did not convert to an evangelical branch of Christianity until they came to the United States. The record on this issue is not so compelling that no reasonable factfinder could fail to find the requisite fear of persecution from the ambiguous evidence in the Country Report that Israel may be less than receptive to proselytizing by its evangelical Christian residents. Compare Valioukevitch v. I.N.S., 251 F.3d 747, 749 (8th Cir. 2001). Thus, the Rifes are ineligible for asylum from Israel.

### III. Withholding of Removal

The Rifes seek withholding of removal to Israel or Azerbaijan. Removal to a specific country must be withheld if the alien establishes a "clear probability" of persecution in that country. See 8 U.S.C. § 1231(b)(3); Ngure, 367 F.3d at 989. "Clear probability" is a more rigorous standard than the well-founded fear of persecution that makes one eligible for asylum. See Regalado-Garcia, 305 F.3d at 788. Thus, the Rifes are not entitled to withholding of removal to Israel. Their firm resettlement in Israel does not bar the Rifes from claiming withholding of removal to Azerbaijan. See Salazar, 359 F.3d at 52, and cases cited. This issue is potentially significant because, if Israel refuses to accept the Rifes, the IJ has ordered them removed to Azerbaijan.

The Rifes argue that they are entitled to withholding of removal to Azerbaijan because it is clearly probable they will be "identified, intimidated, attacked, and possibly even killed" by Muslim extremists the government cannot control. Before they fled Baku, the Rifes were threatened and their roof damaged because they sheltered a family of Armenians from the ethnic and religious hostilities between Armenians and Azeris. However, the IJ found that they were targeted for sheltering refugees rather than for a protected statutory ground. The Rifes are not ethnic Armenians, and they suffered no further harassment after the family left. Nothing in the record suggests that the Rifes would now be the targets of ethnic or religious persecution because of this isolated incident in 1989.

The Rifes fled Baku for Moscow during chaotic times. Ethnic and religious hostilities between Armenia and Azerbaijan caused the Soviet Union to intervene, which in turn prompted local demonstrations against the arriving Russian troops. Alex Rife was beaten and detained while filming the demonstrations. He believes the perpetrators were "KGB." This incident falls well short of establishing a clear probability of persecution if they return to Azerbaijan. Since January 1990, the

Soviet Union has collapsed, and Azerbaijan is now an independent country. At the removal hearing, Alex Rife could not explain to the IJ why he would be persecuted by the present government for this January 1990 incident. Moreover, "[i]t is a well-established principle that minor beatings and brief detentions, even detentions lasting two or three days, do not amount to political persecution, even if government officials are motivated by political animus." Eusebio v. Ashcroft, 361 F.3d 1088, 1091 (8th Cir. 2004).

The Rifes further argue it is clearly probable the Azerbaijan government will persecute them "for proselytizing on behalf of their evangelical Christian beliefs." Though Azerbaijan's citizens are predominantly Muslim, the Azerbaijan Constitution "allows people of all faiths to practice their religion without restrictions." Department of State Country Report on Human Rights Practices for 1996 at 7. The Country Report notes that "[n]on-Orthodox Christian groups have complained of official harassment" and have been attacked by opposition newspapers for missionary activity, but all non-Armenian Christian groups may hold services and conduct religious activities. In an earlier 1993 report, the Justice Department reported that Azerbaijan enacted a Law On Religious Freedom in 1992 that permits "limitations" on religious freedom "in necessary cases," an undefined phrase. This ambiguous record fails to establish a clear probability that the Rifes would suffer religious, ethnic, or political persecution if removed to Azerbaijan. Thus, the denial of withholding of removal to Azerbaijan must be affirmed.

## IV. Voluntary Departure

At the conclusion of removal proceedings, the Attorney General has the discretion to permit a removable alien to depart the United States voluntarily at his or her own expense. See 8 U.S.C. § 1229c(b). For the government, voluntary departure may expedite and reduce the cost of removal. For the affected alien, voluntary departure avoids the stigma of compulsory removal, permits the alien to

select his or her own destination, and facilitates the possibility of return to the United States, for example, by adjustment of status.  See Contreras-Aragon v. I.N.S., 852 F.2d 1088, 1090 (9th Cir. 1988) (en banc).  An alien who fails to voluntarily depart within the specified time period is subject to a civil monetary penalty and is ineligible for voluntary departure and other relief, such as adjustment of status, for a period of ten years.  See 8 U.S.C. § 1229c(d).

In Safaie v. I.N.S., 25 F.3d 636, 641 n.1 (8th Cir. 1994), following the Ninth Circuit's decision in Contreras-Aragon, we held:

> Unless otherwise stated, when this court affirms a decision of the [BIA], which contains a grant of voluntary departure, we intend and it is implied that voluntary departure is granted under the same conditions as stated in the [BIA's] decision and that the time allowed for voluntary departure will begin to run on the date upon which our mandate issues.

At that time, the Immigration and Nationality Act included a number of provisions that prompted this decision.  Aliens petitioning for judicial review were entitled to automatic stays of removal (deportation), 8 U.S.C. § 1105a(a)(3) (1994), but the reviewing court lost its jurisdiction if the alien voluntarily departed the United States, 8 U.S.C. § 1105a(c) (1994).  To avoid forcing the alien to choose between judicial review and the grant of voluntary departure, the BIA conceded that an appeal filed before the departure period expired tolled the running of the period.  But this limited tolling did not solve the problem, because the statute granted the alien ninety days to seek judicial review whereas the agency typically granted only thirty days to depart voluntarily.  Moreover, the agency's decisions to grant or deny voluntary departure were judicially reviewable, so it made sense to postpone the effective date of a voluntary departure order until after the order had been reviewed.  See Contreras-Aragon, 852 F.2d at 1093-95 & n.4.

The BIA's April 2003 order granted the Rifes permission to voluntarily depart "within 30 days from the date of this order or any extension beyond that time as may be granted by the district director." Twenty days later, the Rifes commenced this appeal and moved for a stay of removal pending appeal. The government did not object, and we granted the stay. At oral argument, counsel for the Rifes urged us to to apply the Safaie holding and extend their time for voluntary departure if we deny relief on the merits. After oral argument, Yola Rife moved to dismiss her appeal conditioned on the reinstatement or extension of the thirty-day period of voluntary departure granted by the BIA. The government argues that our jurisdiction to grant this voluntary departure relief was eliminated by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).

We agree that "IIRIRA so recast the statutory landscape that the rationale for [our ruling in Safaie] has been eliminated." Zazueta-Carrillo v. Ashcroft, 322 F.3d 1166, 1170 (9th Cir. 2003). First, IIRIRA abolished judicial authority to review discretionary grants or denials of voluntary departure; only the Attorney General now has the authority to grant this statutory benefit. See 8 U.S.C. §§ 1229c(f), 1252(a)(2)(B)(i). Second, IIRIRA repealed the provision that courts may not review a removal order if the alien has departed the United States. See 8 U.S.C. § 1252(b)(3)(B). This eliminates the dilemma of having to choose between judicial review and voluntary departure, though it does not remove the risk in an asylum case that the alien will depart and suffer the very persecution being litigated before the appeal can be completed. Third, IIRIRA abolished the rule that aliens are entitled to automatic stays of removal upon filing petitions for review. See 8 U.S.C. § 1252(b)(3)(B). This eliminates the practical need for corresponding automatic stays of the voluntary departure period.

These changes remove the statutory bases for our decision in Safaie, but they do not resolve the issue before us. The first question is whether a reviewing court may stay the agency's removal order pending judicial review. IIRIRA expressly

answers this question in the affirmative.  See 8 U.S.C. § 1252(b)(3)(B) (a removal order shall not be stayed pending appeal "unless the court orders otherwise").  Thus, although automatic stays are not appropriate under IIRIRA because an alien's removal does not moot his or her petition for judicial review, all circuits that have considered the question agree that a stay of removal pending appeal may be granted upon a proper showing by the alien.[3]

The government argues that we may not stay the voluntary departure part of a removal order because, under IIRIRA, voluntary departure is a statutory remedy whose exercise by the Attorney General is not subject to judicial review.  But granting a stay does not violate this principle.  Here, the BIA granted voluntary departure after denying the Rifes asylum and withholding of removal.  The question is not whether the agency properly exercised its voluntary departure discretion, which is non-reviewable, but only whether we may stay the agency's grant of this remedy while we review the *removal* order.  The grant or denial of a stay pending appeal is a customary part of the judicial function. See FED. R. APP. P. 8.  Although Congress

---

[3]When there is no right to an automatic stay, the general factors governing the grant or denial of a stay are:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Hilson v. Braunskill, 481 U.S. 770, 776 (1987).  The circuit decisions are in conflict over whether this general standard should be modified to incorporate 8 U.S.C. § 1252(f)(2), which provides that "no court shall enjoin the removal of any alien . . . unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law."  Compare Maharaj v. Ashcroft, 295 F.3d 963, 965-66 (9th Cir. 2002), with Weng v. U.S. Attorney General, 287 F.3d 1335, 1337-40 (11th Cir. 2002).  We need not address that issue.

may restrict our power to grant stays, nothing in IIRIRA expressly precludes us from staying this part of the BIA's order. See Zazueta-Carrillo, 322 F.3d at 1176 (Berzon, J., concurring). Indeed, IIRIRA points strongly in the opposite direction. See 28 U.S.C. § 2349(b) ("the court of appeals in its discretion may restrain or suspend, in whole or in part, the operation of the [agency] order pending the final hearing and determination of the petition"), a statute made applicable to removal cases by 8 U.S.C. § 1252(a)(1).

Because voluntary departure is most beneficial to the government as well as to the alien when a removal order is finally effective, it would make no sense to construe IIRIRA as permitting a stay of removal but precluding a complementary stay of voluntary departure. For these reasons, we agree with decisions holding "that the standards for obtaining a stay of removal [under IIRIRA] shall also apply to stays of voluntary departure." El Himri v. Ashcroft, 344 F.3d 1261, 1262 (9th Cir. 2003); accord Nwakanma v. Ashcroft, 352 F.3d 325, 327-28 (6th Cir. 2003); contra Chumil v. Ashcroft, 89 Fed. Appx. 164, 170 n.6 (10th Cir. 2004). We so held without discussing the issue in Elfarra v. Ashcroft, 88 Fed. Appx. 141, 142 (8th Cir. 2004).

That brings us to the final aspect of this problem, the Rifes' failure to file a motion expressly seeking a stay of their voluntary departure period until long after the thirty-day period granted by the BIA had expired. We are unwilling to overlook an alien's failure to timely raise the issue. Under IIRIRA, automatic stays are improper. Therefore, an alien who petitions for judicial review of a removal order that includes a period for voluntary departure must demonstrate irreparable injury and a likelihood of success on the merits to warrant a stay of the voluntary departure period. We may not ignore this statutory change, which Congress adopted to expedite removals and to curb perceived misuse of the judicial process. Cf. Ballenilla-Gonzalez v. I.N.S., 546 F.2d 515, 521 (2d Cir. 1976), cert. denied, 434 U.S. 819 (1977). In addition, we share the Tenth Circuit's doubt whether we have the authority under IIRIRA to reinstate an agency grant of voluntary departure that has truly

-14-

expired.   See Sviridov v. Ashcroft, 358 F.3d 722, 731 (10th Cir. 2004).  Thus, we will no longer restore or reinstate the voluntary departure privilege for aliens who do not seek relief before the agency-granted period expires.

On the other hand, the Rifes did not ignore the problem.  They filed a motion to stay removal before their voluntary departure period expired.  Because a motion to stay voluntary departure complements and in many cases may be ancillary to a motion to stay removal pending judicial review, we agree with the Ninth Circuit that a middle ground is appropriate in these circumstances: "We therefore hold that where an alien files a motion to stay removal before the period of voluntary departure expires, we will construe the motion to stay removal as including a timely motion to stay voluntary departure."  Desta v.  Ashcroft, 365 F.3d 741, 749 (9th Cir.  2004).

Unlike the Ninth Circuit panel in Desta, we do not hold that every alien who warrants a stay of removal also warrants a stay of voluntary departure.  We leave that issue for the future because there may be cases where the equities relevant to the two types of stay will balance differently.  Thus, aliens petitioning for judicial review of removal orders that include the grant of voluntary departure will be well-advised to file motions for stays that specifically address each issue.  But if, as in this case, the alien files a motion to stay removal before the period of voluntary departure expires, we will deem the grant of that motion to include a stay of the voluntary departure period.  That is particularly appropriate in this case, because the Attorney General did not oppose the Rifes' motion for stay of removal, and our past practice gave them reason to believe that the stay of removal included a stay of their voluntary departure period as well.

## V.  Conclusion

We affirm the IJ's denial of asylum and withholding of removal.  We construe our previous order granting a stay of removal as including a stay of the voluntary

departure period granted by the BIA.  Accordingly, the period in which Alex Rife, Yulia Rife, and Yola Rife may each voluntarily depart the United States in accordance with the BIA's order shall begin to run with the issuance of this court's mandate.  Yola Rife's conditional motion to dismiss her petition for review is granted.

————————————————