02-4992(L)
Iouri v. Ashcroft

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2004

(Argued: March 22, 2005      Decided: September 11, 2006;
Amended: September 13, 2006      On Petition for Rehearing: Decided: May 24, 2007
Amended: May 24, 2007)

Docket Nos. 02-4992(L), 02-4998(CON), 03-40132(CON), 03-40134(CON)

_____

VLADIMIR IOURI and VERA YURIY,
                                                        *Petitioners,*

− *v.* −

JOHN ASHCROFT, Attorney General of the United States,
                                                        *Respondent.*

_____

BEFORE:                    SOTOMAYOR, RAGGI, and HALL, *Circuit Judges.*

_____

Petition for review from a November 27, 2002 decision of the Board of Immigration

Appeals summarily affirming an Immigration Judge's order denying Petitioners' application for

asylum, withholding of return, and relief under the Convention Against Torture. Petitioners also

seek review of a May 29, 2003 order of the Board of Immigration Appeals denying their motion

to reopen proceedings for purposes of adjusting their status to lawful permanent residents.

Petition for review DENIED.

_____

IRINA KOGAN, Brooklyn, New York,

DAN M. KAHAN, Yale Law School Supreme Court
Advocacy Clinic, New Haven, CT; Charles A.
Rothfeld and Andrew Pincus, Mayer, Brown, Rowe
& Maw LLP, Washington, D.C., *for Petitioners*.


JOHN C. CUNNINGHAM, *Senior Litigation Counsel*
(Peter D. Keisler, Assistant Attorney General, Linda
S. Wendtland, Assistant Director, *on the brief*),
Office of Immigration Litigation, Washington, D.C.,
*for Respondent*.

_____

HALL, *Circuit Judge*:

Vladimir Iouri and Vera Yuriy ("Petitioners"), natives of the former Soviet Union and citizens of the now independent Ukraine, petition for review from a November 27, 2002 decision of the Board of Immigration Appeals ("BIA") summarily affirming an Immigration Judge's ("IJ") order finding Petitioners incredible and denying their application for asylum, withholding of return, and relief under the Convention Against Torture ("CAT"). Petitioners also seek review of a May 29, 2003 order of the BIA denying their motion to reopen immigration proceedings. The purpose of the motion to reopen was to adjust their status to that of lawful permanent residents on the basis of approved "immediate relative" petitions filed on Petitioners' behalf by their daughter, a United States citizen. The BIA denied the motion because by the time it was filed, Petitioners had remained in the United States beyond the period granted for voluntary departure and were, therefore, statutorily barred from seeking adjustment of status.

On petition for review, Petitioners raise two issues. First, whether the BIA erred by failing to take into account their advanced age in assessing their credibility. Second, whether their voluntary departure period should be deemed stayed, tolled, or otherwise extended by their

having timely filed for a petition for review and moved for a stay of deportation in their underlying asylum case.

## I. Background

Petitioners—husband and wife—are natives of the former Soviet Union and citizens of the now independent Ukraine. Iouri entered the United States on or about April 4, 1993 as a non-immigrant visitor. Yuriy followed on or about August 3, 1993, also as a non-immigrant visitor. Soon after his wife's arrival, Iouri sought asylum claiming that as a member of the Ukraine Orthodox Church, he was persecuted and has a well-founded fear of future persecution due to his religious beliefs and affiliation.[1]

In his asylum application, Iouri claims that he has long been mistreated due to his religious beliefs. In particular, he asserts that under Communist rule, his family was unable to practice their religion openly, and as a child, he was punished in school for attending Easter services. His application also recounts alleged mistreatment while he served in the army. In Hungary, for example, Iouri asserts he refused to shoot protestors due to his moral and religious convictions, and as a result, he was mistreated and threatened with punishment. Iouri claims his commanding officer arrested him while he was praying.[2] Beyond that, Iouri contends he was generally mocked, threatened, and forced to serve in an "atmosphere of general hostility."

---

[1] Yuriy is claimed as a dependent.

[2] After leaving the army, Iouri claims he studied to be a merchant mariner but was unable to get a job because he refused to fight in Hungary. He states that he eventually found a job in a toy factory where he met his wife. He alleges that the KGB warned his managers about his and his wife's "political unreliability."

According to Petitioners, conditions did not improve with *perestroika* and independence. They report receiving threatening letters and phone calls; letters they sent were opened and inspected; and the Russian Orthodox and Ukranian Catholic churches, backed by the government, did "their best to declare [Petitioner's] religion out-of-law."

Iouri's asylum application, however, made no mention of any specific incidents of abuse or violence against him or his wife. Indeed, Iouri mentioned specific incidents for the first time during an asylum interview and in an addendum to his application submitted to the IJ in June 1999. In the addendum, Iouri claimed that (1) he was attacked in December of 1991 and threatened with death if he did not stop attending religious services; (2) his apartment was vandalized in March of 1992; and (3) in February of 1993, his apartment was again broken into and vandalized, and he was beaten and admitted to the hospital with a ruptured kidney.

A hearing was held on July 6, 2000 at which both Petitioners testified. With regard to the 1991 incident, Iouri claimed for the first time that he was knocked unconscious, suffered injuries to his head and chest, and was hospitalized for seven days. As to the 1992 vandalism incident, he testified that graffiti with death threats was painted on the wall, and when he attempted to report the incident, police informed him the case was closed and advised him to stop practicing his religion. When Yuriy testified, she could not remember the date of the third incident, stating that it occurred either in December of 1992 or February of 1993. She also testified that her husband was attacked on the street, not in the apartment. When brought to her attention that submitted documents indicated the attack occurred in her home, she changed her testimony and stated that a fourth incident in which her husband was beaten occurred sometime in December of

4

1992. Her husband, however, did not testify to that effect, and there is no mention in any of the documents of a December 1992 attack.

The IJ denied Petitioners' application finding that Iouri's testimony was not credible. Specifically, the IJ found his testimony to be "generally halting and vague with regards to some significant events." As to the 1991 incident, the IJ noted that this had not been mentioned anywhere else and there were no documents corroborating that he had been hospitalized. The IJ also noted inconsistencies in the testimony between Iouri and his wife—i.e., she claimed he was attacked in 1993 on the street, not in the apartment, and she testified to a fourth incident never once mentioned by Iouri. Finally, the IJ explained that Iouri was vague in describing the tenets of his faith.[3]

Although the IJ denied Petitioners' application for asylum, he granted their request to voluntarily depart pursuant to former Immigration and Nationality Act ("INA") § 244(e)(1), 8 U.S.C. § 1254(e) (repealed 1996). Petitioners were warned that if they failed to depart voluntarily, the order granting voluntary departure would be withdrawn and they would be ordered deported to the Ukraine. They were also warned, by written order, of the statutory consequences of failing to depart; specifically, they would be ineligible for certain immigration relief, including adjustment of status, for a term of five years. *Id.* §§ 1252b(e)(2) & (5). Petitioners filed a timely appeal which tolled the first thirty days of their voluntary departure

---

[3] In this regard, the IJ noted that Petitioners submitted a letter in support of their asylum application from a rector at a Russian Orthodox Church that Petitioners attend in the United States which, according to other materials is, in fact, the church that caused them problems in the Ukraine.

period.  On November 27, 2002, the BIA summarily affirmed the IJ's decision and granted

Petitioners a new period of voluntary departure lasting until December 27, 2002.

Petitioners filed their petitions for review with this court on December 26, 2002 and

December 27, 2002.  Along with the petitions for review, Petitioners also requested that we grant

them a stay of deportation.  They did not, however, specifically request a stay of their voluntary

departure period or seek an extension of the departure period from the Immigration and

Naturalization Service's ("INS") District Director.  Nor did they depart.  Instead, they filed a

motion before the BIA to reopen proceedings in order to apply for adjustment of status on the

basis of approved "immediate relative" petitions filed on their behalf by their daughter, now a

United States citizen.  The BIA denied their motion because they had overstayed their departure

period and were, therefore, statutorily barred from applying for adjustment of status.  This appeal

followed.

## II. Discussion

*A. Asylum Application*

Because the BIA summarily affirmed the IJ's decision to deny Petitioners' application for

asylum, we review the IJ's decision directly.  *Twum v. INS*, 411 F.3d 54, 58 (2d Cir. 2005).  In

turn, our scope of review is "exceedingly narrow."  *Wu Biao Chen v. INS*, 344 F.3d 272, 275 (2d

Cir. 2003) (internal quotation marks omitted).  In reviewing a denial of an application for asylum,

we "defer to the immigration court's factual findings as long as they are supported by 'substantial

evidence,'" and "we will not disturb a factual finding if it is supported by 'reasonable, substantial

and probative' evidence in the record when considered as a whole."  *Id*. (quoting *Diallo v. INS*,

232 F.3d 279, 287 (2d Cir. 2000)).  Factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

When it comes to credibility determinations, we afford "particular deference" to the IJ in applying the substantial evidence test. *Zhou Yun Zhang v. INS*, 386 F.3d 66, 73 (2d Cir. 2004) (internal quotation marks omitted).  Thus, we look to see whether the IJ has provided "specific, cogent" reasons for her findings and whether those findings bear a "legitimate nexus" to the credibility determinations. *Id.* at 74 (internal quotation marks omitted).  Where a credibility determination is based on specific examples of "inconsistent statements" or "contradictory evidence," a "reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise." *Id.* (internal quotation marks omitted).

Here, the IJ clearly set forth specific and cogent reasons for his adverse credibility finding, stating:

> Again, for all the reasons: the internal discrepancies, the external inconsistencies with information on documents and the addendum to the I-589 request for asylum, the general vagueness of the testimony, the lack of key details and specifics with regard to the most critical portions of the claim, and the significant discrepancies between the testimony of the two respondents; for all these reasons, I find that the testimony does not rise to the level of believability and consistency in detail to provide us with a plausible and coherent account of the basis for the fear, and for that reason a negative credibility finding is made for each respondent.

Tr. 14-15.

These findings are supported by substantial evidence.  As noted above, there were significant discrepancies between Iouri's initial asylum application, the addendum, and his testimony.  For example, the addendum did not note his hospitalization following the first incident and nowhere in the initial asylum application did he mention any of these incidents.

7

More telling are the discrepencies between the testimony of the two Petitioners. Not only did Yuriy testify that the February 1993 incident occurred while her husband was on the street, whereas he testified that it occurred in the couple's home, a fact his spouse would be unlikely to mistake, but she also testified to a fourth incident occurring in December of 1992 which is mentioned nowhere in her husband's testimony, the supporting asylum application, or even the addendum. These inconsistencies are sufficient to support the IJ's adverse credibility findings. *See Gao v. U.S. Atty. Gen.*, 400 F.3d 963, 964 (2d Cir. 2005) (holding adverse credibility supported by substantial evidence where "numerous discrepancies as to dates and surrounding details [and petitioner's] testimony at his asylum hearing differed substantially from his initial written asylum application and first asylum interview. . . .").

Nevertheless, Petitioners argue that the IJ and BIA should have considered the passage of time and their advanced age in assessing their credibility. As the government correctly points out and as Petitioners acknowledge, however, this particular argument was not raised before the BIA and Petitioners therefore failed to exhaust their administrative remedies. Accordingly, this argument has been waived. *See Foster v. INS*, 376 F.3d 75, 78 (2d Cir. 2004) ("To preserve a claim, we require '[p]etitioner to raise *issues* to the BIA in order to preserve them for judicial review.'" (quoting *Cervantes-Ascencio v. INS*, 326 F.3d 83, 87 (2d Cir. 2003))).[4] We therefore

---

[4] Even if we did consider Petitioners' argument, it is without merit. Neither the passage of time nor Petitioners' advanced age adequately explains the inconsistencies here. With the passage of time and age, one expects memory to fade. Details such as dates may be forgotten or inaccurately recalled, but here Iouri totally failed to mention in his initial asylum application—an application filed shortly after his arrival in the United States—several grave incidents which go to the heart of his claim. It was more than five years later that he mentioned them, first in the addendum and then while testifying before the IJ. Similarly, his wife testified to an incident never before mentioned. The severity of these incidents, coupled with the fact that they were not mentioned until sometime later, suggests this is more than a case of mere forgetfulness due to

deny the petitions for review of the underlying asylum application and petition for withholding of return.[5]

*B. Voluntary Departure*

As noted, Petitioners were granted—both by the IJ and the BIA—discretionary relief of voluntary departure in lieu of deportation pursuant to former INA § 244(e)(1).[6] "If adhered to, voluntary departure produces a win-win situation." *Bocova v. Gonzales*, 412 F.3d 257, 265 (1st Cir. 2005). "For aliens, voluntary departure is desirable because it allows them to choose their own destination points, to put their affairs in order without fear of being taken into custody at any time, to avoid stigma and various penalties associated with forced removals . . . and it facilitates the possibility of return to the United States . . . ." *Lopez-Chavez v. Ashcroft*, 383 F.3d 650, 651 (7th Cir. 2004). For the government, it expedites departures and reduces the costs that are typically associated with deporting individuals from the United States. *See Thapa v. Gonzales,* No. 06-1973, 2006 WL 2361248, at *4 (2d Cir. Aug. 19, 2006) *Azarte v. Ashcroft*, 394 F.3d 1278, 1284 (9th Cir. 2005).

Following the BIA's decision to affirm the IJ, Petitioners were required to depart the United States by December 27, 2002. They did not. Instead, on January 23, 2003, they moved

---

either age or passage of time. Accordingly, the IJ cannot be faulted for failing to excuse the inconsistencies or improved recollections on these grounds.

[5] Petitioners have not sought review of their CAT claim.

[6] Section 244(e)(1) provides that "the Attorney General may, in his discretion, permit any alien under deportation proceedings . . . to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish . . . that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure . . . ." 8 U.S.C. § 1254(e)(1).

before the BIA to have their proceedings reopened in order to adjust their status based on "immediate relative" petitions filed on Petitioners' behalf by their daughter and approved by the INS on November 25, 2002. Because they had overstayed their time for voluntary departure, however, the BIA denied the motion. *See* 8 U.S.C. § 1252b(e)(2)(A) (repealed 1996) (aliens who fail to depart within the period for voluntary departure, "other than because of exceptional circumstances, shall not be eligible for [adjustment or change of status under section 245] for a period of 5 years after the scheduled date of departure . . . .").

The BIA's conclusions of law are reviewed *de novo* but where the BIA has applied the correct law, we review its decision to deny reopening for abuse of discretion. *Guan v. BIA*, 345 F.3d 47, 48 (2d Cir. 2003). To get around the otherwise clear statutory bar to their seeking adjustment of status, Petitioners contend that either (1) their period for voluntary departure does not commence until this Court issues the mandate in the underlying asylum case or (2) because they sought a stay of deportation, we should enter a *nunc pro tunc* order staying their voluntary departure period. Either way, Petitioners argue the BIA erred in not granting their motion to reopen.

*i. When does Petitioners' time to depart voluntarily begin to run?*

Citing the Ninth Circuit's decision in *Contreras-Aragon v. INS*, 852 F.2d 1088, 1092 (9th Cir. 1988), Petitioners first argue that their period for voluntary departure does not begin to run until we issue a mandate denying their petition for review in their underlying asylum case. *Contreras-Aragon*, however, is an "old law" case. At the time of *Contreras-Aragaon*, the INA provided for automatic stays of deportation upon the filing of a petition for review. 8 U.S.C. § 1105a(a)(3) (repealed 1996). The *Contrares-Aragon* court reasoned that it was inconceivable

10

"that Congress made such provision but intended to require aliens granted voluntary departure to seek repeated extensions of the voluntary departure period from the district director, in order to preserve the award of voluntary departure until our final determination . . . ." 852 F.2d at 1092. Thus, the court concluded that the right of voluntary departure should remain in effect throughout the period of appellate review and for whatever additional time the BIA afforded the petitioner in its decision. *Id.* In adopting this rule, the court rejected an alternative rule which would have preserved voluntary departure only where the alien petitions for review within the period specified for voluntary departure. Such a rule was unacceptable because, in the court's view, it would "shorten the statutory six month period" provided for under "old law" for filing a petition for review. *Id.* at 1096 (citing 8 U.S.C. 1252(c) (repealed 1996)).

Petitioners here, however, are subject to the rule of IIRIRA, as amended by the REAL ID Act of 2005, because a final deportation order was entered after October 30, 1996. Pub.L. No. 104-208, § 309(c)(4), 110 Stat. 3009, 3009-546, 3009-625; REAL ID Act of 2005, Pub. L. 109-13, § 106(d), 119 Stat. 231, 311. Two changes made applicable by IIRIRA are relevant here. First, automatic stays are no longer granted; an alien must petition the court for a stay of deportation. *Id.* § 309(c)(4)(F). Second, petitions for review must be filed within 30 days of the final order of deportation. *Id.* § 309(c)(4)(C).

These changes have so undercut the rationale of *Contrares-Aragon* that Petitioners reliance on that decision is misplaced. Indeed, these very same changes prompted the Ninth Circuit several years later in *Zazueta-Carrillo v. Ashcroft*, 322 F.3d 1166 (9th Cir. 2003), to reconsider *Contrares-Aragon* and hold that the period for voluntary departure begins to run from

the time the BIA enters its order.[7] *Id.* at 1170-72; *see also Rife v. Ashcroft*, 374 F.3d 606, 614-15

(8th Cir. 2004). Petitioners' period for voluntary departure, therefore, began to run upon

issuance of the BIA's order denying their application for asylum and withholding of return. They

are therefore barred from adjusting their status unless the period for voluntary departure was

stayed, tolled, or otherwise extended by their having filed for a stay of deportation. We now turn

to that issue.

> *ii. Whether the period for voluntary departure may be stayed, tolled, or otherwise extended*

In *Thapa,* 2006 WL 2361248, following the position adopted by the majority of the

Circuits, *compare Bocova*, 412 F.3d at 265-67 (holding that IIRIRA does not limit a court's

authority to issue a stay of departure suspending the running of a voluntary departure period);

*and El Himri v. Aschcroft*, 344 F.3d 1261, 1262 (9th Cir. 2003) ("the District Director's authority

to extend voluntary departure time periods does not limit this court's equitable authority to grant

a stay of the voluntary departure period"); *and Rife*, 374 F.3d at 616 (holding that since IIRIRA

permits stays of removal, voluntary departure can also be stayed); *and Lopez-Chavez*, 383 F.3d at

654 (concluding that under the permanent IIRIRA rules, a stay tolling the time for voluntary

departure may be entered); *and Nwakanma v. Ashcroft*, 352 F.3d 325, 327 (6th Cir. 2003); *with*

*Ngarurih v. Ashcroft*, 371 F.3d 182, 194 (4th Cir. 2004) (holding that voluntary departure may

---

[7] In *Elian v. Ashcroft*, 370 F.3d 897, 901 (9th Cir. 2004), however, the court held that *Contrares-Aragon* still applied to cases governed by then-applicable transitional rules under IIRIRA due to the fact that under those rules the court loses jurisdiction to hear a petition for review if the alien leaves the United States. That we are deprived of jurisdiction under these circumstances may very well be a reason why voluntary departure might appropriately be stayed, tolled, or otherwise extended. It does not, however, provide a reason for *automatically* imposing such a stay until such time as we decide the merits of the underlying petition for review.

not be stayed), we recently held that "we have the authority . . . to stay an agency order [of voluntary departure] pending . . . consideration of a petition for review on the merits." *Thapa,* 2006 WL 2361248, at \*1. We did not address, however, our power to issue such a stay where, as here, the petitioners (1) moved only for a stay of removal and failed to make a motion expressly requesting a stay of voluntary departure, and (2) have now sought such relief well after the time for voluntary departure has expired.

    *iii. Whether Petitioners must have expressly requested a stay of the voluntary departure order*

    In *Thapa,* and most cases where other courts have held the period for voluntary departure may be stayed, the petitioner expressly moved for a stay of voluntary departure. *See id.* at \*3; *see, e.g., Nwakanma*, 352 F.3d at 327; *Lopez-Chavez*, 383 F.3d at 651. In contrast, Petitioners here sought a stay of *deportation*, but not a stay of *voluntary departure*. That said, two circuits—the Ninth Circuit in *Desta v. Ashcroft*, 365 F.3d 741, 743 (9th Cir. 2004), and the Eighth Circuit in *Rife*, 374 F.3d at 616—have held that where an alien files a motion to stay removal before the period for voluntary departure expires, such a motion should be construed as including a motion to stay the voluntary departure period. According to both courts, this is so because, a motion seeking a stay of voluntary departure is "ancillary," *Desta*, 365 F.3d at 748, or "complementary," *Rife*, 374 F.3d at 616, to a stay of deportation. We disagree. For the reasons that follow, we join the First and Seventh Circuits, both of which have held that an alien who wishes to stay the period for voluntary departure must explicitly ask for such a stay. *Bocova*, 412 F.3d at 268; *Alimi v. Ashcroft*, 391 F.3d 888, 892-93 (7th Cir. 2004)

13

When an alien is ordered deported, a warrant by the INS District Director is issued authorizing the officer to take the alien into custody and deport him or her. Gordon, Mailman & Yale-Loehr, *Immigration Law and Procedure* § 72.08[1][a] (rev. ed. 2005). When this Court grants a stay of deportation, we are preventing the forced removal of an alien from the country. Such stays are particularly important in cases governed by IIRIRA's transitional rules because removal of an alien strips this Court of jurisdiction to hear their petition for review. *See Elian*, 370 F.3d at 900. Thus, if we deny a stay of deportation, we deprive ourselves of the opportunity to review a claim, and as a result, we may end up returning an alien to the very persecution he or she was fleeing in the first place.

Voluntary departure, in contrast, is a privilege granted an alien in lieu of deportation. *See Ballenilla-Gonzalez v. INS*, 546 F.2d 515, 521 (2d Cir. 1976). Although it carries with it significant restrictions barring an alien's readmission to the United States, *see Thapa,* 2006 WL 2361248, at *4, voluntary departure affords an alien certain benefits: "[I]t allows [him] to choose [his] own destination points, to put [his] affairs in order without fear of being taken into custody at any time, to avoid the stigma and various penalties associated with forced removals (including extended detention while the government procures the necessary travel documents and ineligibility for readmission for a period of five or ten years, *see* 8 U.S.C. § 1182(a)(9)(A)), and it facilitates the possibility of return to the United States, for example, by adjustment of status." *Id.* An "immigration judge's order granting voluntary departure usually withholds the entry of a deportation order, permitting the respondent to depart within a specified period, and directs that the deportation order shall become effective automatically if respondent does not depart." Gordon, Mailman and Yale-Loehr, supra, at § 74.02[4][c]. Where an alien departs within the

14

specified time period, the alien is not regarded as having been deported and thus obtains the benefits of departure without deportation. *Id.*

In contrast to a stay of deportation, which stops the physical removal of an alien from the country, a stay of voluntary departure stops the clock on the period within which an alien is required to depart and, if granted, effectively extends the time during which an alien is allowed to leave voluntarily. An alien "'does not *lose* something when offered the additional opportunity to depart voluntarily. On the contrary, he retains precisely the same right to judicial review he would otherwise have had; it is only that his alternative to continued litigation has been made more attractive.'" *Harchenko v. INS*, 379 F.3d 405, 412-413 (6th Cir. 2004) (quoting *Castaneda v. INS*, 23 F.3d 1576, 1582 (10th Cir. 1994)). In other words, an alien granted voluntary departure has a choice—leave within the specified time period and retain the benefits afforded, or remain, litigate the claim to the very end, but bear the consequences of having decided not to depart. *See Ngarurih*, 371 F.3d at 194 ("[A]n alien considering voluntary departure must decide whether an exemption from the ordinary bars on subsequent relief is worth the cost of returning to the home country within the period specified. Having made his election, however, the alien takes all the benefits and all the burdens of the statute together.").

The relief sought by a stay of deportation, therefore, is different from that sought by a stay of voluntary departure.[8] Whereas a stay of deportation is aimed at preventing forcible removal, a

---

[8] Under IIRIRA's transitional rules, the relief sought by stays of deportation was particularly significant because removal of an alien under those rules stripped this Court of jurisdiction to hear their petition for review. *See Elian*, 370 F.3d at 900. During the course of this appeal, Congress repealed the IIRIRA transitional rules, reestablishing our jurisdiction to hear the appeals of aliens in spite of their departure. *See Obale v. Att'y Gen.*, 453 F.3d 151, 160 n.9 (3d Cir. 2006) ("Congress enacted 8 U.S.C. § 1252(b)(3)(B) in order to permit judicial review of a removal order even if the alien has departed the United States."). This enactment did

15

stay of the voluntary departure period is a way for the alien to extend the benefits of the privilege of voluntary departure beyond the date the alien was initially afforded. In addition, the equities involved in the two types of stays may also differ. *See Rife*, 374 F.3d at 616 ("[W]e do not hold that every alien who warrants a stay of removal also warrants a stay of voluntary departure . . . because there may be cases where the equities relevant to the two types of stay will balance differently."). Accordingly, we will not construe a stay of deportation automatically to include a stay of the period for voluntary departure. *See Bocova*, 412 F.3d at 268-69 (noting that while the same test for granting a stay of removal applies to a stay of voluntary departure, "that test may play out differently as to each type of relief" so that the alien should be required to "be precise about the relief requested"); *Alimi*, 391 F.3d at 893 (noting that the differences between a stay of removal and a stay tolling the period for voluntary departure "require[] attention by both the

---

not, however, render a stay of deportation and a stay of voluntary departure functionally the same. Notwithstanding the repeal of the IIRIRA transitional rules, these two forms of relief continue to differ in both their practical and equitable respects. Consequently, the Government deserves prompt notice of precisely what relief a petitioner seeks. Indeed, it is a petitioner's responsibility. Under Federal Rule of Appellate Procedure 18, which governs stays pending review of an agency decision, a motion for a stay must include "the reasons for granting the relief requested and the facts relied on." Fed. R. App. P. 18(a)(2)(B)(i). In this case, Petitioners styled their motion as a "stay of deportation" and, in support, noted that because stays are no longer automatically issued they are "subject to being *physically deported* from the United States at any time" and that a "denial of a Stay of Deportation will allow the INS to act to *deport them* and render [the] Petition for Review moot." It is clear, then, that the reasons offered by Petitioners for granting their stay were aimed at deportation rather than their period for voluntary departure. Petitioners thus failed to give appropriate notice that they sought relief in the form of a stay of voluntary departure. As a result, they are now not entitled to that relief. *See Thapa*, 2006 WL 2361248, at *13 (stating that the equities relevant to a stay of a voluntary departure order and a stay of an order of removal may balance differently and concluding that granting Thapa's motion for a stay of the voluntary departure order did not necessitate granting his motion for a stay of the order of removal).

16

parties and the court, attention that is possible only if a stay of removal and extra time for voluntary departure are treated as distinct subjects that must be separately addressed").

        *iv. Whether Petitioners are entitled to nunc pro tunc relief*

        Petitioners would have us now adjudicate their request for a stay of voluntary departure *nunc pro tunc*.[9]  *Nunc pro tunc,* Latin for "now for then," refers to a court's inherent power to enter an order having retroactive effect.  *Black's Law Dictionary* 1100 (8th ed. 2004).  "When a matter is adjudicated *nunc pro tunc*, it is as if it were done as of the time that it should have been done."  *Edwards v. INS*, 393 F.3d 299, 308 (2d Cir. 2004).  It is a "far-reaching equitable remedy" applied in "certain exceptional cases," *Iavorski v. INS*, 232 F.3d 124, 130 n.4 (2d Cir. 2000), typically aimed at "rectify[ing] any injustice [to the parties] suffered by them on account of judicial delay."  *Weil v. Markowtiz*, 829 F.2d 166, 175 (D.C. Cir. 1987).  In the context of agency action, we have held that an award of "*nunc pro tunc* relief [should] be available where agency error would otherwise result in an alien being deprived of the opportunity to seek a particular form of . . . relief."  *Edwards*, 393 F.3d at 310-11.  *See also Ethyl Corp. v. Browner*, 67 F.3d 941, 945 (D.C. Cir. 1995) (noting that *nunc pro tunc* relief has been applied to embrace agency action "where necessary to put the victim of agency error in the economic position it would have occupied but for the error" (internal quotation marks and citation omitted)).

        While we are sympathetic to the position Petitioners find themselves in, this is simply not a case in which *nunc pro tunc* relief is warranted.  As of November 25, 2002, Petitioners' immediate relative petitions were approved.  Two days later, the BIA issued its decision in the underlying asylum case, affirming the IJ's order.  The BIA, however, granted Petitioners an

additional 30 days within which to depart. Petitioners then had several options. First, they could have filed a motion to reopen to adjust their status sooner. Indeed, the record discloses that Petitioners did not move to reopen until January 2003, well after their period for voluntary departure had expired. Second, they could have sought an extension of their period for voluntary departure from the INS District Director. Finally, they could have moved in this Court for a stay of voluntary departure. By exercising any of these options, Petitioners might have preserved their privilege to depart voluntarily. In other words, this is not a case in which error on the part of the court or the INS put Petitioners in a worse position. An order, *nunc pro tunc*, granting a stay of voluntary departure is therefore inappropriate. *Cf. Edwards*, 393 F.3d at 312 (granting *nunc pro tunc* relief to aliens who were erroneously denied the opportunity to apply for INA § 212(c) relief); *Batanic v. INS*, 12 F.3d 662, 667-68 (7th Cir. 1993) (ordering BIA to allow petitioner to apply for asylum *nunc pro tunc* to remedy IJ's error in proceeding with hearing without petitioner's attorney present); *see also Weil v. Markowitz*, 898 F.2d 198, 201 (D.C. Cir. 1990) ("The paradigm case [for *nunc pro tunc* relief] involves a party who has died after his case has been submitted to the court, but before the court has entered judgment. Cases in which a party would otherwise be prejudiced by the clerk's delay in entering judgment stand upon the same footing." (citations omitted)).

Finally, we note one other factor that distinguishes *Desta* and *Rife* from this case. In each of those cases, our sister circuits were concerned that their prior case law had given petitioners reason to believe that they need not file a motion for a stay of voluntary departure. *Desta*, 365 F.3d at 749 ("Based on the prior state of the law, [petitioner] (and his counsel) would have been justified in thinking that the period of voluntary departure would be automatically stayed, just as

18

it had been prior to IIRIRA."); *Rife*, 374 F.3d at 616 ("[O]ur past practice gave [petitioners] reason to believe that the stay of removal included a stay of their voluntary departure period as well."). This concern is notably absent here.

This Court has never held that aliens who file a petition for review are automatically entitled to a stay of voluntary departure. To the contrary, in *Ballenilla-Gonzalez*, we highlighted the fact that the petitioner there had not filed for a petition of review within the thirty days fixed by the period for voluntary departure nor had she requested a stay of the voluntary departure period pending appeal. 546 F.2d at 521. We noted that "[t]hese procedures enable the [BIA] or this court, in cases where a prima facie meritorious basis for appeal is shown, to permit its being pursued without prejudice to voluntary departure." *Id.* Thus, in contrast to the Eighth and Ninth Circuits, both of which had expressly criticized then existing law, in *Ballenilla-Gonzalez* we expressed approval for procedures already in place prior to the passage of IIRIRA. For that reason, we are not concerned, as the courts were in *Rife* and *Desta*, that Petitioners here may have been misled that they did not have to file a motion specifically seeking a stay of voluntary departure. If anything, our decision in *Ballenilla-Gonzalez* should have put them and their counsel on notice that a motion seeking such relief was necessary.

Although we decide that the stay of deportation should not be read so as to encompass a stay of voluntary departure, Petitioners may not be without a remedy. Under pre-IIRIRA regulatory authority, the INS District Director (now the appropriate Field Office Director, U.S. Immigration Customs Enforcement, Department of Homeland Security) may grant a *nunc pro tunc* extension of voluntary departure. *See* 8 C.F.R. § 1240.57 ("Authority to reinstate or extend the time within which to depart voluntarily specified initially by an immigration judge or the

Board is within the sole jurisdiction of the district director."); *see also* 6 Gordon, Mailman & Yale-Loehr, *Immigration Law and Procedure* § 74.02[4][f] (rev. ed. 2005) ("Even after the expiration of the time for voluntary departure fixed by the immigration judge or the Board, a *nunc pro tunc* extension of the voluntary departure time may be granted by the district director if the [alien] presents a valid travel document and a confirmed reservation.  In such cases the district director may cancel the warrant of deportation and may place in the [alien's] file an explanatory memorandum and a copy of the letter authorizing the extension of voluntary departure time.").

Petitioners are both in their mid-to-late 60's and have been in the United States for more than a decade, without event.  Their only child is a United States citizen, and the "immediate relative" petitions she submitted on her parents' behalf have already been approved.  Furthermore, it appears that any delay on Petitioners' part may be attributable to counsel's failure to recommend that they seek to extend their voluntary departure period before overstaying that period, an omission that thereby made them ineligible for adjustment of their status based on approved "immediate relative" petitions.  In this case, the INS District Director might well consider exercising his or her discretion to grant an extension so that Petitioners may adjust their status to lawful permanent residents.  The law does not, however, support this Court granting the relief sought in the pending petitions.

The petitions for review are DENIED.