# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 03-1607 & 03-4010

SELMAN ALIMI, *et al.*,

*Petitioners,*

v.

JOHN ASHCROFT, Attorney General
of the United States,

*Respondent.*

_____

Petitions for Review of Orders of the
Board of Immigration Appeals

_____

ARGUED NOVEMBER 5, 2004—DECIDED DECEMBER 10, 2004

_____

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Selman Alimi entered the United States in 1986 without inspection—in other words, by stealth. He was at the time a citizen of Yugoslavia. When that nation disintegrated, he became a citizen of what the United States calls the Former Yugoslav Republic of Macedonia. Selman evaded detection in this nation for more than four years but in 1990 applied for asylum. He contends that as an ethnic Albanian, and a participant in an organization supporting civil rights for those similarly situated,

he was the victim of persecution. In 1995 Selman's wife Zimrije, and his children Naser and Naim, joined him in the United States, all three entering without inspection. (February 28, 1995, is the date they supplied when immigration officials caught them; at his removal hearing, Selman gave different dates for their entry. Timing could matter, for reasons discussed later, but the Alimis do not now ask us to use any date other than February 28, 1995.) Zimrije, Naser, and Naim sought asylum as Selman's immediate family; they do not contend that they would be entitled to asylum independently.

By 1999, when an immigration judge finally held a hearing to decide whether the family should be removed from the United States, Selman had been in this country for 14 years—and, because he had arrived before December 20, 1990, §203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. 105-100, 111 Stat. 2193, 2196 (1997), as amended, 111 Stat. 2644 (1997), made him eligible for cancellation of removal under 8 U.S.C. §1229b. Despite its name, NACARA confers many of its benefits on aliens from the former communist-bloc nations of eastern Europe. The immigration judge granted Selman relief under NACARA. His asylum claim remained vital for other members of the family, however, as they had not accumulated the seven years' continuous presence essential to this relief. (Normally the period is 10 years for aliens other than permanent residents, and the clock stops when removal proceedings begin, see 8 U.S.C. §1229a(d)(1), §1229b(b)(1), but §203(b) of NACARA, 111 Stat. 2198, modifies these rules for eligible aliens.) The immigration judge concluded that Selman had suffered harassment rather than persecution, and that at all events renewed persecution in the family's native land is unlikely, for much has changed since 1986. By 1999 the Former Yugoslav Republic of Macedonia had become a parliamentary democracy that afforded legal protections to minority groups, including ethnic Albanians.

Four years later the Board of Immigration Appeals affirmed in a one-sentence order. By then Zimrije, Naser, and Naim had eight years' presence, and they asked the Board to reopen its decision so that they could pursue claims for cancellation of removal under §1229b and NACARA. The Board denied this request for two reasons: First, reopening depends on new facts (by which the Board means events that occur after *its* decision, rather than after the immigration judge's, see *Ahmed v. Ashcroft*, 388 F.3d 247 (7th Cir. 2004)), and passing the seven-year mark was not "new." It occurred about a year before the Board's decision, and the Board pointed out that the Alimis could and should have alerted it as soon as they became eligible. Second, the Board noted that an alien who seeks an opportunity to depart voluntarily, and fails to do so, becomes ineligible for cancellation of removal. 8 U.S.C. §1229c(d), 8 C.F.R. §1240.26(a). Immigration officials had allowed the Alimis to depart voluntarily any time before July 7, 2003. They neither departed nor sought the deadline's extension. By allowing the time to lapse, the Board held, the Alimis forfeited their opportunity to obtain NACARA relief. They could have avoided the difficulty by applying before the Board rendered its initial decision, but this just takes us back to the first obstacle: delay in making the request.

Selman contends that the immigration judge's decision with respect to asylum is not supported by substantial evidence, and if this is so then his family would be entitled to a derivative grant of asylum. According to Selman, whose testimony and proffers the judge accepted, Yugoslav police regularly picked him up for questioning about his pro-Albanian activities. The sessions sometimes included threats such as: "We'll take your family away and put them in prison all weekend, also massacre them." These options are so incongruous that the statement is difficult to accept at face value, and the police did not carry through. Family members were not even called in for questioning. After

Selman left, the police sometimes asked his wife what had become of him; these exchanges appear to have occurred at his home. Although the police did not go beyond frequent questioning, private thugs occasionally set upon Selman and his political colleagues; he did not complain to the police, which he distrusted. Some of his friends were imprisoned; the record does not reveal whether their politics alone were the cause, or whether they went beyond speech to unlawful action.

The immigration judge concluded that what happened to Selman, though unpleasant and frightening, amounted to harassment rather than persecution, see *Skalak v. INS*, 944 F.2d 364 (7th Cir. 1991); *Milosevic v. INS*, 18 F.3d 366 (7th Cir. 1994)—and the judge also thought that similar events were unlikely to recur after Macedonia's transition to democracy. Selman concedes that such questioning sessions, which the police called "informative talks," have been unlawful in the Former Yugoslav Republic of Macedonia since 1997. He submits that the police do not always follow the new law, but the fact remains that the risks that persons in his position face are lower today than in the 1980s. Substantial evidence supports the agency's decision that Selman would not now face an objectively significant risk of persecution in his native land. See *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).

We mentioned that the immigration judge accepted Selman's evidentiary proffers. They were needed because the judge cut short some of Selman's proposed testimony, which the judge viewed as repetitious and of marginal relevance. The record also lacks testimony from Zimrije, who had an automobile accident about a week before the hearing and did not feel up to the long drive from the family residence in northern Wisconsin to the hearing in Chicago. The Alimis' lawyer did not seek a continuance until the day set for hearing, and the immigration judge concluded that an offer of proof would be preferable to delay given the

limited information Zimrije had to offer. The Alimis now say that these decisions violate the due process clause of the fifth amendment. The constitutional argument is gratuitous: statutes and rules require fair hearings, and it is inappropriate to bypass these non-constitutional grounds of decision (as the Alimis' brief does). Hearing officers are entitled to regulate the proceedings to curtail wasteful testimony. Cf. Fed. R. Evid. 403. Because the immigration judge invited offers of proof and credited the proffers, the Alimis did not suffer any prejudice. See *Zaidi v. Ashcroft*, 377 F.3d 678, 682 (7th Cir. 2004). Even now the Alimis have not provided affidavits describing helpful evidence that they were prevented from introducing and that the judge did not accept via a proffer. The record was developed adequately and, as we have said, affords substantial evidence for the administrative decision.

This conclusion brings us to the claim under NACARA. We need address only one of the Board's reasons for denying the motion to reopen: that Zimrije, Naser, and Naim did not seek cancellation of removal until after their window for voluntary departure had closed. There is a statutory bar against granting cancellation of removal to an alien after an opportunity for voluntary departure has been granted and allowed to lapse. 8 U.S.C. §1229c(d). (The bar expires after ten years, too late to do the Alimis any good.) The Alimis could have avoided this obstacle in either of two ways: by invoking NACARA as soon as they had accumulated seven years' presence, which they did before the Board made its initial decision; or by electing not to seek the privilege of voluntary departure after the Board's decision. In order to be allowed voluntary departure after removal has been ordered, an alien must establish by clear and convincing evidence that he plans to *use* the privilege and to leave. See 8 U.S.C. §1229c(b)(1)(D). The Alimis made that representation to the immigration judge, who believed them, yet did not leave; they made it again to the district

director following the Board's decision, were believed again, and again let the time pass without departing. Congress has specified that aliens who go back on their word not only must pay a financial penalty, see §1229c(d), but also lose access to some potential benefits. The opportunity to seek cancellation of removal is one of the forfeitures.

What the Alimis now contend is that, despite appearances, their time to depart voluntarily has not expired. On March 7, 2003, this court granted the Alimis' motion for a stay of removal until the BIA's decision on the merits had been reviewed. *Lopez-Chavez v. Ashcroft*, 383 F.3d 650 (7th Cir. 2004), holds that courts have a similar power to stay the expiration of the time for voluntary departure—though per §1229c(f) courts have no authority to grant voluntary departure on their own, or to review an administrative order denying an application for that privilege. See, e.g., *Reynoso-Lopez v. Ashcroft*, 369 F.3d 275, 280 (3d Cir. 2004); *Zazueta-Carrillo v. Ashcroft*, 322 F.3d 1166, 1173 (9th Cir. 2003); *Zulbeari v. INS*, 963 F.2d 999, 1001 (7th Cir. 1992). Although the Alimis never asked us to extend the expiration date for their voluntary departure—we refer to this as a judicial "extension" rather than a "stay" because an opportunity differs from a command, so there is technically no order that can be stayed—they contend that the stay of removal gave them an extension automatically. One court has agreed with this position. See *Desta v. Ashcroft*, 365 F.3d 741 (9th Cir. 2004). Another has rejected it. See *Sviridov v. Ashcroft*, 358 F.3d 722 (10th Cir. 2004) (observing that a court ought not treat as done something that was not even requested). Still a third has split the difference, holding that a stay of removal does not automatically extend the time for voluntary departure but adding that the court may elect to treat the one as accomplishing the other. See *Rife v. Ashcroft*, 374 F.3d 606, 616 (8th Cir. 2004). Yet another has held that appellate courts never can add to the time available for voluntary departure. See *Ngarurih v. Ashcroft*, 371 F.3d 182 (4th Cir. 2004).

*Desta* does not persuade us, for both substantive and pro-cedural reasons. We start with the former. Voluntary departure confers substantial benefits compared with invol-untary removal, and this difference provides an incentive to depart without dragging out the process and without requiring the agency and courts to devote resources to the matter. The Alimis' situation illustrates the incentive. An alien removed from the United States cannot obtain a visa to return for at least five years. 8 C.F.R. §212.2(a). An alien who departs voluntarily may obtain a visa immediately, if eligible for one. Selman became a lawful permanent resident of the United States following the immigration judge's deci-sion. He has filed applications for visas on behalf of Zimrije, Naser, and Naim. If they had used the opportunity for voluntary departure following the immigration judge's decision in 1999, they probably would have received visas and today would be lawful permanent residents themselves. Even after the BIA's decision they could have used this opportunity to depart and rely on Selman's application for immediate-family visas. Instead they decided to remain in the hope that they would prevail on Selman's asylum claim and never have to leave at all. What they now crave is the opportunity to litigate to the last without bearing the attendant costs. They want the chance of winning outright, plus benefits that the law offers to those who avoid litiga-tion through voluntary departure.

This is as if the accused in a criminal prosecution de-manded not only the chance of acquittal at trial but also the benefits that go with a guilty plea and the acceptance of responsibility. If one could have both, the incentive to accept responsibility would disappear. So too with immigra-tion disputes. The United States offers benefits for *volun-tary* departure; an alien cannot resist to the bitter end and still claim those benefits. Just as it is possible in an ex-ceptional situation for an accused to deny guilt, perhaps on a pure point of law, and still receive the benefit that comes

from accepting responsibility for his deeds, see U.S.S.G. §3E1.1 Application Note 2, so we recognized in *Lopez-Chavez* that there may be exceptional situations in which contesting the Board's removal decision may be compatible with voluntary departure. But if as *Desta* holds *every* stay of removal also extends the time for voluntary departure, then the reward will be extended to all litigating aliens, and the incentive to depart voluntarily will be abolished. That would be incompatible with the structure of §1229c. See *Ngarurih*, 371 F.3d at 194.

These substantive differences between a stay of removal and an extension of the time for voluntary departure have a procedural consequence: the entitlement to extra time for voluntary departure must be *demonstrated* rather than assumed, which implies a separate application (or at least a separate argument in one application seeking two forms of relief). An alien who believes that he is entitled to more time for voluntary departure must ask for it explicitly, giving reasons pertinent to this subject. The agency then is entitled to respond. Arguments pro and con about a stay of removal will touch on different equitable and legal considerations; a motion limited to a stay of removal will not discuss (nor will the agency address in response) the question whether it is appropriate for the court to obliterate any incentive to abandon the litigation and depart. Nor, unless the application and response address it, will the court consider the significance of §1229c(b)(2), which sets a limit of 60 days on the length of the voluntary-departure period, once a formal order of removal has been entered. A regulation extends the maximum to 120 days. See 8 C.F.R. §1240.26(f). There is no similar limit on the length of a stay of removal pending a petition for judicial review. It is not clear on what grounds a court could override both statutory and regulatory limits; it is certain that a court ought not extend the time as a byproduct of some other decision, and without confronting the question directly.

Then there is the matter of exhaustion: the Alimis did not seek extra time from the agency any more than they did from the court. An agency is entitled to make an initial decision for itself, and an application for a judicial stay usually must demonstrate that an administrative request has been made and denied. See Fed. R. App. P. 18(a)(1). Like other courts of appeals, we have held that an alien need not ask the Board for a stay of removal. See *Sofinet v. INS*, 188 F.3d 703 (7th Cir. 1999). This is so because an alien may be detained and removed immediately after the decision, and the BIA does not entertain applications for stay. But a window of voluntary departure does not present a similar risk of imminent loss, and the district director does have authority to adjust the time for voluntary departure, so the agency's view should be solicited. Once the court has the agency's response it may apply the criteria for stays mentioned in Rule 18 and recapped in *Sofinet*. Here yet another substantive difference has a procedural consequence. Removal is an irreparable injury; once an alien has left the United States, all possibility of judicial review is gone. See 8 U.S.C. §1105a(c); *Patel v. Ashcroft*, 378 F.3d 610 (7th Cir. 2004). Closing the window for voluntary departure does not cause nearly as great an injury. The petition for review remains pending, and an alien entitled under the law to remain in this nation will have that right vindicated. So the equitable considerations that support a stay of removal for a given alien may not support an extension of that alien's time for voluntary departure; this difference requires attention by both the parties and the court, attention that is possible only if a stay of removal and extra time for voluntary departure are treated as distinct subjects that must be separately addressed.

Nothing in this court's body of decisions would have led the Alimis to believe that a stay of removal automatically extends the time for voluntary departure. Indeed, until *Lopez-Chavez*, which was issued 14 months after the ex-

piration of the Alimis' time to depart voluntarily, this court had not held that such an extension was even legally possible. Likewise *Desta* post-dates the closing of their window. They have no claim of detrimental reliance, even on *Desta* (which was issued seven months after their time for voluntary departure expired) and cannot be surprised by today's decision disapproving the conclusion of *Desta* and holding that an extension of the time to depart must be sought first from the agency and then explicitly from the court, if the agency says no. Zimrije, Naser, and Naim Alimi did not seek cancellation of removal until after their opportunity for voluntary departure had expired. Consequently they are ineligible for that relief, and their petitions for review of the Board's orders are

DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*