

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-3-2009

# Sandie v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 07-1865

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Sandie v. Atty Gen USA" (2009). *2009 Decisions.* Paper 1449.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1449

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-1865

EMMANUEL TANGO SANDIE,
                                                    Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                                    Respondent

On Petition for Review from the Board of Immigration
Appeals
BIA No. A98-775-770
Immigration Judge: The Honorable Miriam Mills

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 20, 2008

Before: SMITH, COWEN, *Circuit Judges*

and THOMPSON, *District Judge*[*]

(Filed: April 3, 2009)

Alexander Maltas
Latham & Watkins
555 11th Street, N.W.
Suite 1000
Washington, DC 20004

Michele R. Pistone
Villanova Law School
Clinic for Asylum Refugee & Emigrant Services
299 North Spring Mill Road
Room 4
Villanova, PA 19085
        *Attorneys for Petitioner*

Lindsay B. Glauner
Unites States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Theodore C. Hirt
United States Department of Labor

---

[*]The Honorable Anne E. Thompson, Senior United States District Judge for the District of New Jersey, sitting by designation.

Office of Immigration Litigation
Room 5312
450 5th Street, N.W.
Washington, DC 20001

Michael P. Lindemann
John D. Williams
Unites States Department of Justice
Office of Immigration Litigation
Suite 700S
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Attorneys for Respondent*

------

OPINION

------

SMITH, *Circuit Judge.*

Emmanuel Tango Sandie petitions for review of a Board of Immigration Appeals (BIA) decision denying him asylum. Sandie claims he has a well-founded fear of persecution. He alleges that a secret group, the Wonde & Poro Society, will kill him, if he returns to his native Sierra Leone, because he refuses to become their Supreme Leader. Alternatively, if he were to acquiesce and become Supreme Leader of this group, he claims that he would be tortured and forced to commit murder as part

of its leadership initiation ritual. The BIA affirmed the Immigration Judge's (IJ) determination that Sandie failed to corroborate his story and so failed to carry his burden of proof. Because the BIA committed no error in reviewing the IJ's corroboration determination, we will deny Sandie's petition.

Sandie successfully moved to stay his removal while his petition for review was pending. Subsequently, Sandie sought clarification that his motion to stay removal implicitly included a request to stay the voluntary departure period. Because removal and voluntary departure are different measures implicating different equities, we hold that a request to stay a voluntary departure period is not implicit in a motion to stay removal. Accordingly, we will deny Sandie the relief he seeks.

I.

Sandie is a citizen and native of Sierra Leone. He arrived in the United States in December 2003 to attend high school for one semester, entering as a non-immigrant J-1 visitor with authorization to remain until June 9, 2004. Sandie remained in the United States beyond that date. On March 5, 2005, he applied for asylum, withholding of removal, and protection pursuant to the Convention Against Torture (CAT).

In April 2005, the Department of Homeland Security initiated removal proceedings against Sandie. Before the Immigration Court, Sandie conceded removability and renewed

4

his application for asylum, withholding of removal, and protection under CAT.

The IJ heard Sandie testify in support of his application on November 22, 2005. She denied Sandie's application on March 24, 2006, finding that Sandie's testimony was not credible and that, even if his testimony were viewed as "weak" instead of not credible, he failed to meet his burden of proof due to a lack of reliable evidence to corroborate his testimony. At the same time, the IJ granted Sandie's request to depart voluntarily from the United States.

Sandie appealed the IJ's decision denying his application for asylum. On February 23, 2007, the BIA affirmed the IJ's determination that Sandie failed to corroborate his story so that even if Sandie's testimony were presumed credible, he did not meet his burden of proof. The BIA also concluded that Sandie had not established that his refusal to become the Supreme Leader of the Wonde & Poro Society was cognizable as a political opinion under the Immigration and Nationality Act, which requires fear of persecution based on race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). This petition for review followed.[1]

---

[1]Sandie also argues that he fears persecution based on kinship and family ties, rather than political opinion. He makes this argument for the first time on appeal, however, so that there

## II.

We have jurisdiction to review final orders of the BIA under 8 U.S.C. § 1252. The BIA focused its review on the IJ's determination that Sandie failed to meet his burden of proof with evidence corroborating his testimony. Because the IJ's corroboration discussion and determinations are affirmed and partially reiterated in the BIA's decision, we review them along with the BIA decision. *See Guan v. Gonzales*, 432 F.3d 391, 394 (3d Cir. 2005) ("Where . . . the BIA agrees with the IJ's conclusion that a petitioner is not credible and, without rejecting any of the IJ's grounds for decision, emphasizes particular aspects of that decision, we will review both the BIA's and IJ's opinions—or more precisely, we review the IJ's decision including the portions not explicitly discussed by the BIA.") (internal citations omitted); *see also Korytnyuk v. Ashcroft*, 396 F.3d 272, 287 (3d Cir. 2005) ("[W]hile the 'final order' we review is that of the BIA . . . [t]here are some situations in which a court of appeals effectively reviews an IJ's decision . . . .") (internal quotation marks and citation omitted); *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004) ("Inasmuch as the BIA deferred to the IJ's credibility determinations and adopted

---

is no record to review on this issue. As we explained in *Xie v. Ashcroft*, 359 F.3d 239 (3d Cir. 2004), we are without jurisdiction, *see* 28 U.S.C. § 1252(d)(1), to decide issues where the alien has failed to exhaust all available remedies. *Xie*, 359 F.3d at 246 n.8.

the reasons the IJ set forth, we have authority to review both determinations."); *Xie v. Ashcroft*, 359 F.3d 239, 242 (3d Cir. 2004) ("[T]he BIA also appears to have substantially relied upon the adverse credibility finding of the IJ. Accordingly, we have jurisdiction to review both the BIA's and IJ's opinions."). The BIA expressly stated, however, that it would not address the IJ's finding that Sandie's testimony was not credible. Consequently, we have no credibility determination to review and we will assume that Sandie's testimony is credible. *Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 2003).

Under 8 U.S.C. § 1158(b)(1)(A), the Secretary of Homeland Security and the Attorney General have the discretionary power to grant asylum to a person who qualifies as a refugee. A refugee is "any person who is . . . unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A). Sandie contends he qualifies for refugee status because he has a well-founded fear of persecution on account of a political opinion. He alleges a secret Wonde & Poro Society will kill him in Sierra Leone because he refuses to become their Supreme Leader.

To establish the existence of a well-founded fear of persecution, an applicant must prove an objectively reasonable possibility of statutorily cognizable persecution, *Leia v.*

7

*Ashcroft*, 393 F.3d 427, 433 (3d Cir. 2005), and that the applicant's professed fear is genuine, *Lusingo v. Gonzales*, 420 F.3d 193, 199 (3d Cir. 2005). That means he must demonstrate his professed fear is objectively reasonable and not merely subjective, and that this fear is rooted in persecution recognized by 8 U.S.C. § 1101(a)(42)(A).

We review factual findings, including findings of persecution and fear of persecution, under the substantial evidence standard. *Toure v. Att'y Gen.*, 443 F.3d 310, 316 (3d Cir. 2006). Under this deferential standard, "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it—and also compels the further conclusion that Elias-Zacarias had a well-founded fear that the guerrillas would persecute him *because of* that political opinion."). "[T]he overriding consideration here must be the extraordinarily deferential standard mandated by *Elias-Zacarias*." *Chen*, 376 F.3d at 226 (internal quotation omitted).

We review legal conclusions *de novo*. *Smriko v Ashcroft*, 387 F.3d 279, 282 (3d Cir. 2004).

8

III.

Sandie cites *Miah v. Ashcroft*, 346 F.3d 434 (3d Cir. 2003), to argue that, as a matter of law, the BIA must review the IJ's credibility determination before affirming the IJ's conclusion that Sandie did not meet his burden of proof. According to Sandie, the credibility determination is a necessary predicate to the corroboration determination. He claims that a credibility assessment controls the quality and quantity of additional evidence needed to meet the burden of proof.

In *Miah*, the BIA had expressly repudiated the IJ's adverse credibility determination, yet "essentially adopted the IJ's corroboration findings." *Id.* at 440. We explained:

> [T]estimony found to be incredible by the IJ was transformed into credible testimony by the BIA. However, the BIA does not explain how the transformation affects the degree of corroboration now required for Miah to sustain his burden of proof. In other words, now that Miah is deemed to be a credible asylum applicant, which of the events on which he bases his claim must he now corroborate and to what degree? Is the level of corroboration the same as when his testimony was deemed incredible?

*Id.* We concluded that the BIA should have conducted an independent analysis of corroboration because the IJ's

9

corroboration ruling was informed by its adverse credibility determination. *Id.*

*Miah* does not apply here. First, the BIA has not transformed Sandie's incredible testimony into credible testimony. The BIA simply did not reach the IJ's credibility finding. Second, unlike in *Miah*, the IJ's determination that Sandie failed to meet his burden of proof with evidence corroborating his story does *not* depend on her adverse credibility finding; the IJ's corroboration determination was separate and independent from that finding.

The IJ denied Sandie's application for two alternative reasons. On one hand, the IJ held that even if Sandie's testimony were deemed credible, Sandie would have to corroborate his story and he failed to do so. On the other hand, the IJ explained, Sandie's testimony was not credible. Because the IJ's corroboration determination did not depend on her finding that Sandie's testimony was not credible, we hold that the BIA did not err in reviewing the IJ's corroboration determination without reviewing the finding on credibility.

Sandie further argues, however, that, because the BIA did not review credibility, we must assume his testimony is credible, in which case he has met his burden of proof. We agree that we must assume Sandie's testimony is credible because we have no credibility determination to review from the BIA. *See Kayembe*, 334 F.3d at 235. But the assumption that his testimony is

10

credible does not imply that that testimony is sufficient to meet his burden of proof. In fact, credible testimony alone is not always sufficient to meet the burden of proof. *See, e.g.*, *Chukwu v. Att'y Gen.*, 484 F.3d 185, 192 (3d Cir. 2007) ("Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence."); *Chen v. Gonzales*, 434 F.3d 212, 221 (3d Cir. 2005) ("[E]ven a credible asylum applicant may be required to supply corroborating evidence in order to meet [her] burden of proof.") (internal quotation marks omitted); *Kayembe*, 334 F.3d at 235 ("If the BIA's decision can be found to be supported by substantial evidence, even if Kayembe's testimony is credible, then the absence of a finding on credibility is not significant to the disposition of the case."); *Abdulai v. Ashcroft*, 239 F.3d 542, 554 ("We . . . hold that the BIA may sometimes require otherwise-credible applicants to supply corroborating evidence in order to meet their burden of proof."). Even assuming Sandie's testimony was credible, he may still be required to corroborate aspects of his testimony in order to meet his burden of proof.[2]

---

[2]The REAL ID Act of 2005 provides further guidance on when corroboration is required:

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies

11

Moreover, an applicant for asylum must provide reliable evidence to corroborate testimony when it is reasonable to expect corroborating evidence and there is no satisfactory explanation for its absence. *Toure*, 443 F.3d at 323. It is reasonable to expect corroboration for testimony that is central to an applicant's claim and easily subject to verification. *Chukwu*, 484 F.3d at 192. And "no court shall reverse a determination made by a trier of fact with respect to availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such

> the trier of fact that the applicant's testimony is credible, is persuasive, and refers to the specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence."

8 U.S.C. § 1158(b)(1)(B). This provision does not apply to asylum applications filed before May 11, 2005, *see Chukwu*, 484 F.3d 185 at 192 n.2, and does not apply to this case.

12

corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4).[3]

Nevertheless, before concluding that an applicant did not meet the burden of proof for lack of corroboration, the IJ must conduct the following three-part "*Abdulai*" inquiry: (1) identify the testimony for which it is reasonable to expect the applicant to produce corroboration; (2) examine whether the applicant corroborated that testimony; and (3) analyze whether the applicant has adequately explained any failure to provide corroboration. *Chukwu*, 484 F.3d at 192 (citing *Abdulai*, 239 F.3d at 554 (3d Cir. 2001)). Additionally, the IJ must give the applicant notice of what aspects of the applicant's testimony need corroboration. If the applicant cannot produce corroborating evidence, the IJ must also afford the applicant an opportunity to explain why. *Id.*

On this score, Sandie argues that finding insufficient evidence to corroborate his testimony is not consistent with the record, which includes statements from multiple witnesses and two experts. He also argues that he was not afforded notice and opportunity to explain the dearth of evidence about the Wonde & Poro Society. Indeed, Sandie contends that he has a good reason for not proffering more evidence to corroborate his

---

[3]This provision, added by the REAL ID Act of 2005, was made applicable to all cases upon enactment on May 11, 2005, *Chukwu v. Att'y Gen.*, 484 F.3d 185, 192 n.3 (3d Cir. 2007), and applies in this case.

13

testimony about the Wonde & Poro Society: it is a secret society.[4]

Based on our review of the record and of the IJ's decision, we conclude the IJ was reasonable in requiring corroboration. The IJ was clear that she sought reliable evidence to corroborate Sandie's allegations about the existence, nature, and activities of a secret Wonde & Poro Society that Sandie alleged would kill him or force him to commit murder. She also

---

[4]Sandie also argues that the IJ and BIA determined he did not meet his burden of proof simply on the basis that they thought the precise name of the Wonde & Poro Society was not corroborated. This misrepresents the IJ and BIA determinations. Sandie sought asylum in the United States alleging that he had a well-founded fear that the Wonde & Poro Society would kill him if he returned to Sierra Leone because he refused to become their Supreme Leader. Consequently, the existence and nature of the Wonde & Poro Society are central to Sandie's claim. The BIA and IJ referred to the Wonde & Poro Society's name simply to underscore the paucity of reliable evidence Sandie provided to corroborate his testimony. They noted that Sandie's testimony was so poorly corroborated that uncertainty remained even as to the name of the group. This does not mean that the IJ and the BIA believed corroboration was lacking *only* as to the name of the Wonde & Poro Society; rather, inconsistent testimony about the name was symptomatic of the lack of corroboration of Sandie's testimony on the nature and the existence of the group Sandie described.

14

sought evidence to corroborate Sandie's allegations about the origin and significance of the ritualistic back scar Sandie claimed he received during a two-week vacation with his grandfather in the summer of 1999, and which, according to Sandie, marked him as a successor Supreme Leader. These allegations are central to Sandie's claim that he fears persecution in Sierra Leone.

The IJ also adequately worked through the three-part *Abdulai* inquiry, put Sandie on notice of the allegations he needed to corroborate, and afforded him an opportunity to explain the deficiencies in corroboration. After his November 22, 2005 hearing before the IJ, but prior to the IJ's March 24, 2006 ruling, Sandie submitted reports from Drs. Kamara and Sanchez in an attempt to bolster his testimony about the existence and nature of the Wonde & Poro Society, and the ritual scar mark on his back. In submitting these reports, Sandie demonstrated that he knew the IJ expected evidence to corroborate his testimony on the Wonde & Poro Society and his back scar. The time lapse between Sandie's hearing and the IJ's ruling also shows that Sandie had ample opportunity to produce such evidence or explain  why he could not do so. The IJ determined that the Kamara and Sanchez reports did not assist Sandie in meeting his burden of proof, and no other objective evidence in the record confirms the contentions central to Sandie's claims. There is thus nothing in the record that would compel a reasonable adjudicator to reach a conclusion contrary to the IJ's. We conclude that the BIA committed no error in its

15

review of the IJ's corroboration determination, and, accordingly, we will deny Sandie's petition.

IV.

We now turn to Sandie's motion to clarify. Although Sandie's appeal to the BIA was unsuccessful, the BIA granted Sandie's request to depart voluntarily from the United States and accorded him 60 days—until April 24, 2007—to do so. Sandie filed a petition for review of the BIA's decision on March 23, 2007. One month later, Sandie filed a motion to stay removal, which we granted on August 2, 2007. The motion for a stay of removal did not separately request a stay of voluntary departure, however. On December 4, 2007, never having explicitly moved to stay the running of the voluntary departure period, Sandie filed the instant motion to clarify that his motion to stay removal implicitly included a request to stay the 60-day voluntary departure period.

Sandie argues that recognizing a stay of the period for voluntary departure based on his motion to stay removal is appropriate because voluntary departure became an issue for him only in September 2007. He explains that, on September 21, 2007, he married a United States citizen and that a failure to comply with the voluntary departure order will preclude him from obtaining adjustment of status to legal permanent resident under 8 U.S.C. § 1255(a). *See* 8 U.S.C. § 1229c(d); 8 C.F.R. 1240.26(a). According to Sandie, he could not have reasonably

16

foreseen this emergent need to stay the period of voluntary departure when he filed his motion to stay removal. Citing *Obale v. Att'y Gen.*, 453 F.3d 151 (3d Cir. 2006), Sandie points out that we previously asserted jurisdiction to stay a voluntary departure period where the stay was expressly requested *before* the voluntary departure period had expired.

In *Obale*, we also noted that the courts of appeals were divided "on the issue of whether courts should read a petition for a stay of removal as implicitly including a petition for stay of voluntary departure." *Id.* at 160 n.10. At the time, the Sixth, Eighth, and Ninth Circuits incorporated a request for a stay of the voluntary departure period into requests for stay of removal, *see Macotaj v. Gonzales*, 424 F.3d 464, 467 (6th Cir. 2005); *Rife v. Ashcroft*, 374 F.3d 606, 616 (8th Cir. 2004); *Desta v. Ashcroft*, 365 F.3d 741, 745-56 (9th Cir. 2004), whereas the First and Seventh Circuits rejected that view and required an explicit and particularized request for a stay of voluntary departure, *see Bocova v. Gonzales*, 412 F.3d 257, 268 (1st Cir. 2005); *Alimi v. Ashcroft*, 391 F.3d 888, 892–93 (7th Cir. 2004). At the time, we expressed no view on the question. *Obale*, 453 F.3d at 160 n.10. Since *Obale*, the Second Circuit has held that an alien seeking to stay the voluntary departure period must explicitly ask for such a stay. *Iouri v. Ashcroft*, 487 F.3d 76, 85 (2d Cir. 2007) ("[W]e join the First and Seventh Circuits, both of which have held that an alien who wishes to stay the period for voluntary departure must explicitly ask for such a stay.").

17

The relief Sandie requests would require us to disregard the nature of voluntary departure and the differences between voluntary departure and removal. As to the former, the Supreme Court recently observed that:

> Voluntary departure is an agreed-upon exchange of benefits, much like a settlement agreement. In return for anticipated benefits, including the possibility of readmission, an alien who requests voluntary departure represents that he or she "has the means to depart the United States and intends to do so" promptly. Included among the substantive burdens imposed upon the alien when selecting voluntary departure is the obligation to arrange for departure, and actually depart, within the 60-day period.

*Dada v. Mukasey*, 128 S. Ct. 2307, 2319 (2008).[5] Strict limits on

---

[5]Effective January 20, 2009, a new regulation provides that "[t]he filing of a petition for review has the effect of automatically terminating the grant of voluntary departure, and accordingly also does not toll, stay, or extend the period allowed for voluntary departure." 8 C.F.R. § 1240.26(f). Although inapplicable to Sandie's case, this new regulation moots the issue as of the regulation's effective date by clarifying that the filing of a petition for review automatically *terminates* the grant of voluntary departure. The new regulation thus reinforces the nature of voluntary departure as an "agreed-upon exchange of

the time allowed for voluntary departure confirm that the alien's prompt departure is a key attribute of the privilege of voluntary departure. *See, e.g.*, 8 C.F.R. § 1240.26(e) ("If voluntary departure is granted at the conclusion of proceedings, the immigration judge may grant a period *not to exceed* 60 days.") (emphasis added). Moreover,

> Authority to extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is only within the jurisdiction of the district director, the Deputy Executive Associate Commissioner for Detention and Removal, or the Director of the Office of Juvenile Affairs . . . . In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act.

*Id.* at § 1240.26(f).

The voluntary departure option seeks to encourage prompt departure of the alien with various privileges accruing to an alien who departs within the specified period, as well as the threat of penalties that apply where the alien does not do so.

---

benefits," and stresses the *choice* an alien must make between the benefits of voluntary departure, with its concomitant obligation to depart promptly, on one hand, or pursuing litigation without agreeing to depart promptly, on the other.

19

If an alien fails to depart within the time allotted by the agency, the alien may be fined up to $5,000 and may become ineligible for benefits, such as adjustment of status, for a period of ten years. *See* 8 U.S.C. § 1229c(d); *Alimi*, 391 F.3d at 891 ("Congress has specified that aliens who go back on their word [that they will promptly depart] not only must pay a financial penalty . . . but also lose access to some potential benefits.").

An order of removal, in contrast, is not an agreed-upon exchange between the alien and the Government. It does not implicate a choice in view of incentives and penalties like those which are part of the voluntary departure bargain. In short, an order of removal and a grant of voluntary departure are different decrees implicating different equities. *See, e.g.*, *Bocova*, 412 F.3d at 270 (concluding that "there may be cases in which an alien is entitled to a stay of removal but not a stay of voluntary departure"); *Alimi*, 391 F.3d at 892 ("Voluntary departure confers substantial benefits compared with involuntary removal, and this difference provides an incentive to depart [promptly].").

Moreover, the particular issues attendant to the voluntary departure agreement warrant consideration that they would not receive if a motion to stay voluntary departure were merely implicit in a motion to stay removal. For this reason, an alien seeking to stay voluntary departure must explain why such a stay is justified notwithstanding the alien's prior agreement to depart voluntarily and the strict time limits for departure imposed by regulation. *See Alimi*, 391 F.3d at 892 ("[S]ubstantive

20

differences between a stay of removal and an extension of the time for voluntary departure have a procedural consequence: the entitlement to extra time for voluntary departure must be *demonstrated* rather than assumed, which implies a separate application . . . .”). Moreover, the Government is entitled to notice of the relief an alien seeks and the reasons why the alien believes that relief is justified. Yet the Government would be deprived of such notice, and the opportunity to respond, if a motion to stay the voluntary departure period were implicit in a motion to stay removal.

Thus, we will not simply assume that a request for staying removal implicitly includes a request to stay the voluntary departure period. Having pursued voluntary departure, an alien accorded that privilege must expressly ask for a stay of the voluntary departure period before its expiration, or request withdrawal of the order of voluntary departure. Further, we do not have the authority to reinstate or extend a period of voluntary departure. *See Reynoso-Lopez v. Ashcroft*, 369 F.3d 275, 284 (3d Cir. 2004). Accordingly, we will deny Sandie’s motion.