**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3552
_____

GREGORIO AGUSTIN MENDOZA,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent
_____

On a Petition For Review of an Order
of the Board of Immigration Appeals
(Agency No. A070-652-982)
Immigration Judge: Charles Honeyman
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 23, 2012

Before:  SLOVITER, GREENAWAY, JR. and COWEN, <u>Circuit</u> <u>Judges</u>

(Opinion filed: May 24, 2012)
_____

OPINION
_____


PER CURIAM

        Gregorio Agustin Mendoza ("Mendoza") petitions for review of the Board of

Immigration Appeals' final order of removal.  For the reasons that follow, we will deny

the petition for review.

Mendoza, a native and citizen of Guatemala, arrived in the United States in June, 1989 at the age of 15, at or near Brownsville, Texas. In October, 1993, Mendoza filed an application for asylum and withholding of removal, in which he stated that he came from Rio San Juan, Guatemala, and he fled the region because guerrillas had kidnapped his cousin. Mendoza was interviewed by an asylum officer on September 25, 2007, and, on that same day, he was served with a Notice to Appear for removal proceedings, which charged that he was removable under Immigration & Nationality Act ("INA") § 212(a)(6)(A), 8 U.S.C. § 1182(a)(6)(A), as an alien present in the United States without being admitted or paroled. It is undisputed that Mendoza is removable as charged.

The Immigration Judge held a merits hearing on July 9, 2008. Mendoza renewed his application for asylum, and submitted a personal statement with his renewed application. Mendoza stated that he left Guatemala because of the civil war between the government and the guerrillas. His father was a member of the Civil Patrol, and thus a supporter of the government. Guerrillas first approached Mendoza at his home and sought to recruit him when he was 9 years old. His mother turned them away. Eventually, the guerrillas were chased from the village by the army, but then Mendoza had to deal with the army's discriminatory conduct toward the villagers as indigenous people. Mendoza's family and others spoke a dialect and could not communicate well with the army.

In 1985, the guerrillas returned. Houses were ransacked and food and tools were taken. Mendoza and other boys hid from the guerrillas. The villagers could not turn to the army for help because of the army's perception that the villagers were sympathetic to

2

the guerrillas. In 1987, Mendoza's cousin was kidnapped by the guerrillas. His cousin was never seen, or heard from, again. In 1986, his sister was raped by the guerrillas, an experience which traumatized her and the family. In 1989, Mendoza's family decided that he was not safe and that the army could not or would not protect him from the guerrillas, and so he was sent to the United States. Mendoza has since been in touch with his family, who have told him that gangs have replaced the guerrillas, and would try to hurt or kill him, or kidnap him and hold him for ransom. Moreover, the government continues to discriminate against the indigenous people of Guatemala. In addition to his updated statement, Mendoza submitted the 2007 State Department Country Report on Human Rights Practices for Guatemala, and several articles detailing violence in Guatemala.

At his merits hearing on July 9, 2008, Mendoza testified that he has two brothers and a sister who live in the United States, and his parents and two other sisters still live in the family home in Guatemala. His family has told him that it is better for him to remain in the United States because of gang problems in Guatemala and for economic reasons. The gangs are "Salvatrucha" and "18," A.R. 115, and they are violent and kidnap people for ransom. Mendoza sends his family $1,000 every month from his work as a laborer. Mendoza knows that the civil war in Guatemala ended in December, 1996. However, gang members recently came to his parents' house. Villagers sounded an alarm which scared the gang members off, and no one was harmed. Mendoza explained how the army had previously discriminated against the people of his village because they are indigenous and speak a dialect. The soldiers would call them "donkeys" and "stupid."

3

A.R. 121. Mendoza now speaks Spanish well enough to communicate with non-indigenous Guatemalans. He testified that the "Maras" gangs were made up of rich people who attack poor people, and they assault people for political reasons and for "narco traffic." A.R. 125.

At the conclusion of the hearing, the IJ denied Mendoza's application for asylum and withholding of removal, and granted his alternative request for voluntary departure. The IJ found Mendoza credible, and found his proof that gangs in Guatemala are not completely under the control of the government persuasive. Nevertheless, the IJ concluded that Mendoza had not met his burden of proof because he did not show that he suffered any past experiences that were severe enough to constitute persecution. The threats and harassment he experienced at the hands of the guerillas was insufficient. As to his fear of the Maras gangs should he return to Guatemala, the IJ reasoned that his family continued to live in Guatemala and they had not experienced any serious problems. In addition, the IJ concluded that there was no evidence in the record to suggest that Mendoza faced any possibility of persecution based on his being an indigenous Guatemalan. The IJ observed that, if Mendoza had intended to argue that he was a member of a particular social group consisting of indigenous Guatemalans who had lived in the United States and feared gangs, his claim would fail because this social group lacked the required level of "social visibility." In short, the IJ was of the view that Mendoza's primary reason for not wanting to return to Guatemala was economic, and that his fear of the gangs was vague and unsubstantiated. Mendoza was granted voluntary departure, and an order of removal to Guatemala was issued in the alternative.

4

Mendoza appealed to the Board of Immigration Appeals, contending that he had established persecution due to the fact that he was an indigenous person. A.R. 11. He had been taunted by government soldiers because he did not speak Spanish and assumed to be in league with the guerrillas. The guerrillas similarly persecuted him, harassing and threatening him, and trying to recruit him because he was an indigenous person. Moreover, Guatemala now was plagued with gangs, which, instead of fighting the government as the guerrillas once had, stole from and persecuted indigenous people. See id.

On July 31, 2009, the Board affirmed the IJ and dismissed Mendoza's appeal. The Board agreed with the IJ that Mendoza had not met his burden of proof to show a vulnerability to persecution on account of his indigenous ethnicity, citing our decision in Abdille v. Ashcroft, 242 F.3d 477, 494 (3d Cir. 2001). The Board further noted that, since the IJ's decision, it had issued two precedential decisions addressing fear of criminal gangs, Matter of E-A-G-, 24 I. & N. Dec. 591 (BIA 2008) (applying "social visibility" requirement, and holding that youth who are subjected to harassment and/or recruitment by gangs are not a particular social group within the meaning of the INA), and Matter of S-E-G-, 24 I. & N. Dec. 579 (BIA 2008) (applying "particularity" and "social visibility" requirements, and holding the same), and had also held that affluent Guatemalans do not qualify as a particular social group, see Matter of A-M-E- & J-G-U-, 24 I. & N. Dec. 69 (BIA 2007). Under these decisions, Mendoza's fear of mistreatment by gangs on the basis of his perceived affluence would not suffice to constitute a protected particular social group.

5

Mendoza timely petitions for review of the Board's decision. We have jurisdiction pursuant to 8 U.S.C. §§ 1252(a), (b)(1). After this case was briefed, we decided Valdiviezo–Galdamez v. Att'y Gen. of U.S., 663 F.3d 582 (3d Cir. 2011) ("Valdiviezo–Galdamez II"), and then invited the parties to comment on whether this case had any effect on Mendoza's petition for review.[1] The Attorney General responded that the case had no effect, because, in his opening brief, Mendoza only argued that he had suffered past harm and had a well-founded fear of future persecution on account of his ethnicity as an indigenous Guatemalan. Mendoza submitted a similar response that the case had no effect on his petition for review because he was arguing past persecution only on account of his ethnicity and not on account of "his social group as a 'youth.'" Petitioner's Response, at 1.

With this clarification of Mendoza's argument, we will deny the petition for review, addressing only whether Mendoza suffered past harm and had a well-founded fear of future persecution on account of his ethnicity as an indigenous Guatemalan. Where the Board adopts and affirms the IJ's decision as it did here, and provides some analysis of its own, we review both decisions. Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004). We review the agency's determination of whether an alien has established eligibility for asylum and withholding of removal under the substantial evidence

---

[1] Mendoza's case was stayed pending our decision in Valdiviezo-Galdamez II, 663 F.3d at 603–08, where we held that the Board's requirements of "particularity" and "social visibility" were not entitled to deference, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), because they were inconsistent with a number of cases in which the Board had found that a proposed social group was a "particular social group" under the standard it had earlier established in Matter of Acosta, 19 I. & N. Dec. 211.

6

standard, treating the factual findings as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B); Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992) (reversal of the agency's decision requires a finding that the evidence not only supports reversal but compels it).

To establish eligibility for asylum on the basis of past persecution, an alien must make a credible showing that he suffered some harm rising to the level of persecution on account of a statutorily protected ground, and that it was committed by the government or forces the government is unwilling to control. Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Race is a protected ground under the INA. 8 U.S.C. § 1101(a)(42)(A). An applicant for asylum bears the burden of proof. See Abdille, 242 F.3d at 482.

The IJ and the Board determined that what happened to Mendoza himself – threats and harassment by the guerrillas and name-calling by the military – did not rise to the level of persecution, and the record does not compel a contrary conclusion, see Kibinda v. Att'y Gen. of U.S., 477 F.3d 113, 119-20 (3d Cir. 2007) (five-day detention resulting in minor injury did not amount to persecution); Voci v. Gonzales, 409 F.3d 607, 615 (3d Cir. 2005) (single beating that does not result in serious physical injury does not compel reversal of the Board's decision that alien did not suffer past persecution). Mendoza did not argue that he personally was harmed. Persecution is defined as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." Kibinda, 477 F.3d at 119 (quoting Fatin v. Immigration & Naturalization Serv., 12 F.3d 1233, 1240 (3d Cir. 1993)). It refers only to "severe"

7

conduct and "does not encompass all treatment our society regards as unfair, unjust or even unlawful or unconstitutional." Id.

Evidence of his cousin's kidnapping is relevant to Mendoza's claim because he shares his cousin's ethnicity, see generally Matter of Salim, 18 I. & N. Dec. 311, 312 (1982) (applicant sufficiently established that he would be singled out for persecution by Soviet regime where he had been member of Mujahidin and two of his brothers had been arrested for similar membership and another brother was taken by Soviet troops and applicant did not know his whereabouts or whether he was still alive). Finding Mendoza to be credible, the agency should have expressly addressed this evidence of severe conduct as it applied to Mendoza's individual claim of persecution, cf. Zheng v. U.S. Att'y Gen., 549 F.3d 260 (3d Cir. 2008) (agency has to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim).[2] Mendoza does not, however, seek a remand on the ground that the agency failed to explicitly consider this evidence or improperly regarded it as having no bearing on his claim, nor does he argue that this evidence alone compels a reversal of the agency's determination that he does not qualify for asylum. Any such claim is thus waived. See Nagle v. Alspach, 8 F.3d 141, 143 (3d Cir. 1993) (absent extraordinary circumstances

---

[2] The IJ addressed the claim that his sister was raped, but determined that it had little bearing on Mendoza's application, A.R. 31, which is apparent enough given that the application was based not on a fear of being raped but on a fear of being kidnaped. The IJ further noted that "the kidnapping of his cousin" was evidence of harm that "befell" Mendoza and his family members, id., but then inexplicably failed to explain why this was not material evidence of severe conduct that supported Mendoza's claim of past persecution. The Board made no mention whatever of this evidence of severe conduct.

8

appellant must present argument in support of each issue raised on appeal or such issues are abandoned and waived).[3]

In the absence of evidence of past persecution, the alien must demonstrate a subjective fear of persecution through credible testimony that his fear is genuine, <u>Zubeda v. Ashcroft</u>, 333 F.3d 463, 469 (3d Cir. 2003), and the alien must show that a reasonable person in his circumstances would fear persecution if returned to the country in question, <u>see</u> <u>id.</u> Here, the agency's determination that Mendoza could not establish a well-founded fear of persecution on the basis of his ethnicity is supported by substantial evidence. Mendoza argued in his brief that the guerrillas still existed in the form of gangs, including the Maras. Instead of fighting the government, they now persecute the indigenous population with impunity. "Indeed, the treatment of indigenous Guatemalans [by the guerrillas, the gangs, and the government] has not changed since the end of the civil war." Petitioner's Brief, at 21. Further, we note that the 2007 State Department Country Report confirms that indigenous communities, for example, the Mayans and the Xinca, suffer discrimination. The report details the existence of "social cleansing" groups, which have committed hundreds of killings. A.R. 158. The Country Report

---

[3] A demand from the agency for Mendoza to corroborate the relationship and his cousin's kidnapping and death would in any event have been reasonable. Corroboration may be required, even from credible applicants, <u>see</u> <u>Abdulai</u>, 239 F.3d at 554, where it is (1) reasonable to expect the applicant to produce corroboration, (2) the applicant fails to corroborate, and (3) the applicant fails to adequately explain that failure, <u>Chukwu v. Att'y Gen. of U.S.</u>, 484 F.3d 185, 191-92 (3d Cir. 2007) (citing <u>Toure v. Att'y Gen. of U.S.</u>, 43 F.3d 310, 323 (3d Cir. 2006). <u>See</u> <u>also</u> <u>Sandie v. Att'y Gen. of U.S.</u>, 562 F.3d 246, 252-53 (3d Cir. 2009) (same). The disappearance and likely death of his cousin was central to Mendoza's claim of persecution and could have been verified either by his family in Guatemala or his family here in the United States.

acknowledges that the Guatemalan government has not done enough to prevent the notion of racial superiority or to eradicate racial discrimination against the non-Spanish speaking, often illiterate rural indigenous population. A.R. 169.

Nevertheless, substantial evidence supports the Board's determination that Mendoza did not establish a well-founded fear of persecution on account of his indigenous ethnicity. His primary concern is that he will be perceived to have money and thus targeted for kidnapping, but this is insufficient to establish a well-founded fear of persecution on the basis of his indigenous ethnicity. See Abdille, 242 F.3d at 494 (random violence or criminal activity not motivated by animosity against a particular ethnic or social group, but rather by arbitrary hostility or a desire to reap financial reward, does not constitute persecution). Moreover, Mendoza has learned enough Spanish in the United States to communicate with non-indigenous Guatemalans, thus mitigating one of the factors known to cause trouble for indigenous persons. Last, Mendoza's family members, who are similarly situated, remain in Guatemala and have not been harmed, which undercuts any argument that Mendoza's fear is objectively reasonable. See Zubeda, 333 F.3d at 469.

Withholding of removal requires Mendoza to demonstrate a clear probability that he will face persecution on account of a protected ground if returned to Guatemala. See & Naturalization Serv. v. Stevic, 467 U.S. 407 (1984). Because Mendoza could not meet the asylum standard, he necessarily cannot satisfy the withholding of removal standard. See also Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 430 (1987) ("would be threatened" standard has no subjective component).

10

For the foregoing reasons, we will deny the petition for review.